PEOPLE v SMITH

Docket No. 103833. Argued October 9, 1997 (Calendar No. 4). Decided
     March 17, 1998.

Larry D. Smith was convicted by a jury in the Kent Circuit Court,
     Dennis B. Leiber, J., of first-degree criminal sexual conduct. The
     trial court, over the objection of defense counsel, admitted a hear-
     say statement made by the complainant ten hours after the defend-
     ant's assault as an excited utterance. The Court of Appeals,
     MACKENZIE, P.J., and McDONALD and O'CONNELL, JJ., affirmed in an
     unpublished opinion per curiam, holding that although the state-
     ment did not qualify as an excited utterance, its admission was
     harmless because it was cumulative, given the complainant's testi-
     mony. The Court further found no denial of the effective assistance
     of counsel because, although defense counsel faced a pending fel-
     ony charge in the same court, the judge and the prosecutor
     involved were not the same as those in the defendant's case
     (Docket No. 148757). The defendant appeals.

     In an opinion by Justice WEAVER, joined by Chief Justice MALLETT,
     and Justices BOYLE and TAYLOR, the Supreme Court held:

     The hearsay statement was admissible as an excited utterance.
     The defendant was not denied effective assistance of counsel.

     1. An excited utterance under MRE 803(2) is a statement relating
     to a startling event or condition made while the declarant was
     under the stress of excitement caused by the event or condition.
     The rule allows admission of hearsay testimony that otherwise
     would be excluded because it is perceived that a person under the
     sway of excitement precipitated by an external startling event will
     not have the reflective capacity essential for fabrication so that any
     utterance will be spontaneous and trustworthy. It is the lack of
     capacity to fabricate, not the lack of time to fabricate, that is the
     focus of the rule. The question is not strictly one of time, but of the
     possibility for conscious reflection. There is no express time limit
     for excited utterances, and whether the declarant was still under
     the stress of the event is given wide discretion.

     2. In this case, there is no question that the sexual assault was a
     startling event, and the statement was made while the complainant
     was still under the overwhelming influence of the assault, render-

ing it reliable and admissible. Under the circumstances, a continuing level of stress arising from the assault precluded any possibility of fabrication. In the light of the entire record, the statement was admissible as an excited utterance.

3. To demonstrate that a conflict of interest denied a defendant the Sixth Amendment right to counsel, the defendant must establish that an actual conflict of interest adversely affected counsel's performance by showing that the performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense so as to deny a fair trial. There is no automatic correlation between an attorney's theoretical self-interest and an ability to loyally serve a defendant. In this case, no evidence was cited to suggest that defense counsel actively lessened his defense as a result of his pending felony charge, nor is there evidence of an actual conflict of interest on the record. To the contrary, defense counsel vigorously pursued his objections and presented a strong case.

Affirmed.

Justice BRICKLEY, joined by Justices CAVANAGH and KELLY, concurring in part and dissenting in part, stated that the circumstances of this case do not demonstrate a level of continuing stress sufficient to satisfy the threshold for admission of the complainant's statement as an excited utterance. While profound hysteria is not required, something more than unusual or extraordinary behavior must be evident before it can reasonably be concluded that a hearsay declarant spoke under an immediate and uncontrolled domination of the senses. The complainant's statement was made after there was more than sufficient time to permit reflective thought, and, thus, was inadmissible. Also militating against the admissibility of the complainant's statement is the fact that it was made in response to his mother's persistent questioning, and was not the product of the uncontrolled domination of the senses. It did not possess sufficient indicia of reliability to justify its admission as an excited utterance under MRE 803(2).

The admission of the complainant's statement also was not harmless error. No corroborating evidence of the alleged sexual assault was offered independent of the complainant's testimony. Further, it was not merely cumulative of properly admitted in-court testimony, but was used to bolster the complainant's credibility. Thus, it cannot be safely concluded that the complainant's statement did not have a substantial effect on the jury's decision.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *William A. Forsyth*, Pros-

ecuting Attorney, and *Timothy K. McMorrow*, Chief
Appellate Attorney, for the people.

State Appellate Defender (by *Richard B. Ginsberg*)
for the defendant.

Amicus Curiae:

*William A. Forsyth*, President, *John D. O'Hair*,
Prosecuting Attorney, and *Timothy A. Baughman*,
Chief, Research, Training and Appeals, for Prosecut-
ing Attorneys Association of Michigan.

WEAVER, J. We granted leave in this case to deter-
mine whether a hearsay statement, made approxi-
mately ten hours after an event, was properly admit-
ted under MRE 803(2) as an excited utterance. Fur-
ther, we address whether defendant was denied the
effective assistance of counsel because his attorney
was charged with a felony pending in the same
county. We hold that the hearsay statement was
admissible as an excited utterance and that defendant
was not denied effective assistance of counsel. The
defendant's conviction and sentence are affirmed.

I

The complainant was a sixteen-year-old high school
sophomore when he joined the gym where he met
defendant. Complainant joined the gym to improve
his chances of making the varsity baseball team.
Defendant was a thirty-one-year-old bodybuilder,
from whom others, including complainant, sought
weightlifting advice. At some point, defendant and
complainant exchanged telephone numbers. Com-
plainant testified that, at that time, defendant had told
him that he "expected" complainant to call him.

Shortly thereafter, in January 1991, complainant telephoned the defendant to invite him out for a movie and pizza. Defendant picked the complainant up and then picked up defendant's roommate to join them. Defendant testified that he and his roommate had been in a homosexual relationship for two years. That evening, the conversation revolved around baseball and bodybuilding. Complainant testified that he did not understand why defendant's roommate had come along.

One week later, complainant called defendant to ask if defendant wanted to go bowling. Defendant suggested they watch a movie at defendant's house instead. Defendant again picked complainant up and they returned to defendant's house. Complainant testified that while watching the movie defendant said that he found complainant interesting and asked complainant if he was open-minded. Sometime later defendant asked him, "What do you think about getting your dick sucked?" Complainant responded, "I'm not funny, if that's what you mean."

Soon thereafter, two women stopped by for directions to a party. Defendant led them by car to the party with complainant in the front passenger seat. Complainant testified to a growing uneasiness. In response to this uneasiness, defendant said he would take complainant home. Defendant briefly went into the party and came out with a man whom he drove to the store for more beer. When complainant attempted to move to the backseat of the car, defendant said to him, "You don't have to take the backseat for nobody." After going to the store, the three went back to the party, where defendant and complainant stayed

for a brief time. After leaving the party, defendant took complainant back to defendant's house.

Upon return to defendant's house, complainant testified that defendant offered to involve him in a business venture if complainant would allow defendant to perform fellatio on him. Complainant testified that he told defendant that the proposition was "sick." Complainant testified that at this point the defendant got very angry, that the defendant would not allow him to leave, and that the options offered by defendant became increasingly violent. Complainant testified further that defendant told him to leave and then would not allow him to go, and that complainant became increasingly frightened. Defendant then promised to take complainant home after defendant smoked a joint, but instead of taking him home at that point, defendant offered complainant other choices. Defendant gave the complainant the choice between fighting defendant, who outsized complainant by eight inches and one hundred pounds, or allowing defendant to perform fellatio on him. When complainant asked to use the telephone, defendant said, "You're just going to call your mom . . . . I'll just beat her up. I'll beat up whoever comes over, or I'll just call my friends to beat them up." Complainant testified that defendant then pushed him and hit him in the chest and leg.

At that point, a group of people came to the door and defendant told complainant to be quiet because they had guns. After the people left, complainant testified that defendant gave him another option: either let defendant perform fellatio or he would give him over to the people who were coming by again later and who were "sicker" than defendant and into

"S & M." Complainant testified that defendant then held scissors to his neck to force compliance with defendant's request. When complainant assented, defendant first told him that he was not gay and would take complainant home. But minutes later, defendant reiterated his threat. Again, complainant assented and defendant told him that he would stop on complainant's request. Defendant then performed fellatio on complainant. After about one minute, and at complainant's request, defendant stopped.

Although defendant testified that there was a conversation regarding open-mindedness and his homosexuality, he denied that he became violent or forced complainant to allow him to perform fellatio. He denied any sexual contact with complainant.

The defendant then drove the complainant home at approximately 1:45 in the morning. Complainant's mother testified that she came to the door when complainant returned home because he was having a difficult time getting the door unlocked. She inquired if anything was wrong and testified that his response was, "Oh, mom, leave me alone." She observed that complainant seemed tearful and emotional. Without answering his mother's second inquiry, complainant abruptly left the room and took a bath with the water running continually for approximately one hour. The mother observed complainant pacing the floor and punching his hand into his fist. She testified further that at approximately 5:30 A.M., complainant was uncharacteristically sleeping on the livingroom couch, though his bedroom was adjacent to the livingroom, and that his eyelashes appeared wet.

At 11 o'clock the next morning complainant awoke. He testified that he asked his father for a weightlifting

bench, and that his father responded, "Maybe later." Later he asked his mother, who said she would buy him a bench for his birthday in June. His mother testified that at that moment complainant stated, "Mom, I can't wait that long," and started crying and rocking back and forth. She further testified that when she asked him what was wrong, he responded, "Oh, mom, I had to be sucked off last night before I can [sic] even come home."

It is this statement to which defense counsel objected. However, the court ruled that the statement was admissible as an excited utterance. The jury ultimately convicted defendant of first-degree criminal sexual conduct. Defendant appealed, challenging among other issues, the admission of the hearsay statement. Further, defendant claimed that he was denied his Sixth Amendment right to counsel, because, at the time of trial, his attorney had been charged with a criminal offense in the same county.

The Court of Appeals affirmed the conviction for different reasons. It held that the statement did not qualify as an excited utterance, but that the admission of the statement was harmless error because it was cumulative, given complainant's testimony. With respect to the effective assistance of counsel argument, the Court found no conflict of interest because the judge and the prosecutor involved in counsel's case were not the same as those in defendant's case. This Court granted leave limited to these issues. 454 Mich 873 (1997).

II

We generally review a trial court's determination of evidentiary issues for an abuse of discretion. *People v*

*Adair*, 452 Mich 473, 482; 550 NW2d 505 (1996), citing *People v Perkins*, 424 Mich 302, 308; 379 NW2d 390 (1986). Close questions arising from the trial court's exercise of discretion on an evidentiary issue should not be reversed simply because the reviewing court would have ruled differently. *People v Bahoda*, 448 Mich 261, 289; 531 NW2d 659 (1995), quoting *People v Golochowicz*, 413 Mich 298, 322; 319 NW2d 518 (1982). The trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion. *Id.*

MRE 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rule allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the "sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy." 5 Weinstein, Evidence (2d ed), § 803.04[1], p 803-19.

In *People v Straight*, 430 Mich 418, 424; 424 NW2d 257 (1988), this Court cited the two primary requirements for excited utterances: 1) that there be a startling event, and 2) that the resulting statement be made while under the excitement caused by the event. *Straight* clarified *People v Gee*, 406 Mich 279, 282; 278 NW2d 304 (1979), which had split the second requirement into two inquiries: whether the statement was made before there was time to contrive and misrepresent, and whether it related to the circumstances of the startling occasion. *Straight* explained:

> Properly understood, *Gee*'s requirement that the statement must "be made before there has been time to contrive and misrepresent" is simply a reformulation of the inquiry as to whether the statement was made when the witness was still under the influence of an overwhelming emotional condition. [*Id.*, p 425.]

This explanation clarified that it is the lack of capacity to fabricate, not the lack of time to fabricate, that is the focus of the excited utterance rule. The question is not strictly one of time, but of the possibility for conscious reflection. 5 Weinstein, *supra*, § 803.04[4], p 803-23.

In this case, the Court of Appeals found that, although the complainant was still under the stress of the assault, "the statement did not qualify as an excited utterance because . . . the statement was made after there was sufficient time to permit reflective thought." Unpublished opinion per curiam, decided July 11, 1995 (Docket No. 148757). This reasoning is flawed. Though the time that passes between the event and the statement is an important factor to be considered in determining whether the declarant was still under the stress of the event when the statement was made, it is not dispositive. It is necessary to consider whether there was a plausible explanation for the delay. *Gee*, p 283. Unlike MRE 803(1), the present sense impression exception, which requires that the "statement describing or explaining an event or condition [be] made while the declarant was perceiving the event or condition, or immediately thereafter," there is no express time limit for excited utterances. "Physical factors, such as shock, unconsciousness, or pain, may prolong the period in which the risk of fabrication is reduced to

an acceptable minimum." 5 Weinstein, *supra*, § 803.04[4], p 803-24.[1] The trial court's determination whether the declarant was still under the stress of the event is given wide discretion. McCormick, Evidence (3d ed), § 297, p 857.

There can be no question that the sexual assault in this case was a startling event. The question is whether the complainant was still under the stress of the assault when he stated to his mother ten hours later, "I had to be sucked off last night before I can [sic] even come home." The circumstances preceding and surrounding the statement convince us that the statement was made while the complainant was still under the overwhelming influence of the assault and, therefore, that the statement was reliable and admissible.

We find that the complainant's actions upon arriving home were extraordinary. When he arrived home at approximately 1:45 A.M., he took an hour-long bath and let the water run that entire time. Afterward, he paced the living room and his mother observed him punching his fist into his hand. At approximately 5:30 A.M., complainant uncharacteristically slept on the couch, though his bedroom adjoined the living room. His mother observed that he appeared to have been crying. At approximately 11 o'clock the next morning, the complainant asked his father and mother separately for a weight bench. His father said maybe, and later, when his mother said yes, but not for three months, complainant broke into tears. When his

---

[1] Instead of treating physical conditions as a factor to consider in excited utterance analysis, the dissent would create a new rule which makes physical factors such as shock, unconsciousness, or pain a prerequisite for the admission of an excited utterance after a lapse of time.

mother asked what was wrong, complainant made the statement in question. We agree with the trial court that these circumstances describe a continuing level of stress arising from the assault that precluded any possibility of fabrication.

The defense cites not only the time lapse between the event and the statement, but also the fact that the statement was made in response to questioning. Like the question of elapsed time, whether a statement made in response to questioning should be excluded under MRE 803(2)  depends on the circumstances of the questioning and whether it appears that the statement was the result of reflective thought. McCormick, *supra*, p 857.  In *Straight*, the Court found that the stress caused by the parents' suggestive questioning of their four year old immediately after the child's pelvic area had been examined for evidence of molestation may well have supplanted any residual stress from an alleged assault. *Id.*, p 426. Though acknowledging that the questioning was not grounds for automatic exclusion, the Court could not be sure that the stress of the alleged assault was continuing. Unlike the questioning in *Straight*, the mother's inquiries of the complainant when he arrived home and the following morning were not suggestive, nor can the two inquiries be characterized as persistent and insistent. Contrasted with the questioning in *Straight* during which the four-year-old complainant's parents repeatedly asked the child to tell them what happened until she answered,[2] there is nothing about the mother's inquiries in the present case that undermines confidence in the conclusion that the complainant's state-

---

[2] See *Straight, supra* at 421, n 1.

ment resulted from the stress of the assault and not
from the "stress" of his mother's inquiries. Further,
the lapse of time between the event and the state-
ment was shorter in this case than it was in *Straight*,
and we find no evidence suggesting that the stress
arising from the assault had abated.[3]

One final rationale for excluding the statement is
that complainant's request for a weight bench might
appear self-serving or at least to exemplify rational
thought. However, from our review of the circum-
stances surrounding the statement, fabrication seems
a remote possibility. It appears that the "dam simply
broke" after complainant realized that in order to
keep weightlifting, he would have to go to the gym
where he would be faced with seeing defendant.
Thus, we hold that the trial court did not abuse its
discretion by admitting the statement because we find
that statement was admissible as an excited
utterance.[4]

Even if we were to agree with the Court of Appeals
that it was error to admit complainant's statement, we
would affirm the Court of Appeals ruling that the
error was harmless. The Court of Appeals concluded
that the error was harmless because the statement
was cumulative to the victim's own in-court testi-
mony. We clarify that the fact that the statement was
cumulative, standing alone, does not automatically
result in a finding of harmless error. Harmless error
review requires reversal only if the error is prejudi-

---

[3] In *Straight*, the statement was not made until approximately one
month after the incident. *Id.* at 421.

[4] We acknowledge that this statement is nearing the outer limits of
admissibility under the excited utterance exception, and trial courts
should be so cautioned.

cial. *People v Mateo*, 453 Mich 203, 215; 551 NW2d 891 (1996) (summarizing the articulations of harmful error in MCL 769.26; MSA 28.1096, MCR 2.613[A], and MRE 103). The inquiry into prejudice "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." *Id.* The reviewing court must consider the entire record. *Id.*, p 217. Although the statement in question is certainly alarming in content, we find no prejudice requiring reversal in light of the entire record. Complainant had already testified regarding the escalating threats and forced fellatio. Further, the mother's testimony, which was replete with evidence of the complainant's distress upon his arrival home, corroborated complainant's testimony. Nor can we say, given the entire testimony of the mother and complainant, that the defendant's theory, his denial of the threats and forced fellatio, was eroded by admission of the statement.[5]

III

Defendant argues that he was denied the effective assistance of counsel in violation of his Sixth Amendment rights because his attorney was charged with a felony pending in the same county. Defendant asks

---

[5] The dissent relies on *Straight, supra*, to support its conclusion that admission of the statement was not harmless error. In *Straight*, Justice BOYLE concluded that, when viewed as a "one-to-one credibility contest between the child and defendant," this Court could not conclude that the parents' testimony regarding the complainant's statements did not influence the jury's decision. *Id.* at 427-428. However, *Straight* is distinguishable because it involved the testimony of a five-year-old complainant, while the present case involves the testimony of a sixteen-year-old complainant whom the defense had full opportunity to cross-examine. Thus, in light of all the evidence, we conclude that the admission of the statement did not tip the scales in favor of a guilty verdict.

that we presume a conflict of interest exists whenever an attorney is being prosecuted in the same county as a criminal defendant whom he represents. We decline to create such a rule and hold instead that in order to demonstrate that a conflict of interest has violated his Sixth Amendment  rights, a defendant "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v Sullivan*, 446 US 335, 350; 100 S Ct 1708; 64 L Ed 2d 333 (1980).[6]

In *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994),  this Court adopted the ineffective assistance of counsel standard articulated by *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).  To prove a claim of ineffective assistance of counsel under *Pickens* and *Strickland*, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense so as to deny defendant a fair trial. *Strickland*, pp 688-689. In dicta however, *Strickland* cited *Cuyler*'s rule for cases involving ineffective assistance of counsel claims premised on an actual conflict of interest. *Id.*, p 692. *Cuyler* calls for a heightened standard in conflict of interest claims. In circumstances involving a conflict of interest, *Cuyler* stated that "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, p 692. This heightened standard is not a rule of

---

[6] Const 1963, art 1, § 20  provides no greater protection than the Sixth Amendment  of the federal constitution. *People v Pickens*, 446 Mich 298, 326; 521 NW2d 797 (1994).

prejudice per se; rather, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Id.*, quoting *Cuyler, supra,* pp 348-350.

*Cuyler* involved an alleged conflict of interest arising from an attorney's representation of codefendants. Defendant argues that a potential conflict of interest between an attorney and his client is more serious than the representation of codefendants and, therefore, claims that a rule of prejudice per se is necessary. However, we find our reasoning in *People v Pubrat,* 451 Mich 589; 548 NW2d 595 (1996), persuasive in this case. In *Pubrat,* we held that an attorney's suspension from the practice of law does not create a presumption of ineffective assistance of counsel. We reasoned, "[a]ttorneys may be suspended from the practice of law for a multitude of reasons . . . [and] there is no necessary correlation between an attorney's suspension and competency . . . ." *Id.*, p 598. Similarly, we find that there is no automatic correlation between an attorney's theoretical self-interest and an ability to loyally serve a defendant. As in *Pubrat,* we recognize the potential for an attorney's self-interest to conflict with the representation of a defendant and that in such a case a finding of ineffective assistance of counsel would be warranted. If a convicted defendant believes that his attorney's representation was below an objective standard of reasonableness, the appropriate procedure is to seek a *Ginther* hearing. *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973).

We find that a rule per se is inappropriate and favor the reasoned approach of *Cuyler, supra.* In this case,

defendant has cited no evidence to suggest that defense counsel actively lessened his defense as a result of his pending felony charge, nor do we find evidence of an actual conflict of interest on the record. To the contrary, defense counsel vigorously pursued his objections and presented a strong case.

IV

The defendant's conviction and sentence are affirmed.

MALLETT, C.J., and BOYLE and TAYLOR JJ., concurred with WEAVER, J.

BRICKLEY, J. (*concurring in part and dissenting in part*). I dissent from that part of the lead opinion upholding the admission of the complainant's hearsay statement to his mother approximately ten hours after the alleged assault. First, I believe that the majority erroneously concluded that the statement was admissible as an excited utterance under MRE 803(2). Second, I believe that the error was not harmless under the reasoning of this Court in *People v Straight*, 430 Mich 418; 424 NW2d 257 (1988). For these reasons, I would reverse the decision of the Court of Appeals and remand the case for a new trial.

I

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Generally, hearsay evidence is inadmissible unless it fits within one of the established exceptions to the hearsay rule. MRE 802. Exceptions to the hearsay rule are based on factors

that provide assurances of testimonial reliability suffi-
cient to dispense with the usual means of purging tes-
timony of error and falsehood, i.e., an oath, cross-
examination, and the trier of fact's assessment of the
declarant's veracity. McCormick, Evidence (3d ed),
§ 245, pp 726-727.

As the lead opinion correctly recognizes, the ration-
ale for the excited utterance exception to the hearsay
rule is based on the perception that a person who is
still under the "sway of excitement precipitated by an
external startling event will not have the reflective
capacity essential for fabrication so that any utter-
ance will be spontaneous and trustworthy." 5 Wein-
stein, Evidence (2d ed), § 803.04[1], p 803-19. The
lead opinion also correctly observes that it is the lack
of capacity to fabricate, not the lack of time to fabri-
cate, that is the focus of the exception. However, I
believe the majority is unfaithful to the important
principles that it espouses.

The majority sets forth the following "extraordi-
nary" facts to support its conclusion that the com-
plainant's statement was made while still under the
continuing stress of the alleged sexual assault:

> When he arrived home at approximately 1:45 A.M., he took
> an hour-long bath and let the water run that entire time.
> Afterward, he paced the living room and his mother
> observed him punching his fist into his hand. At approxi-
> mately 5:30 A.M., complainant uncharacteristically slept on
> the couch, though his bedroom adjoined the living room.
> His mother observed that he appeared to have been crying.
> At approximately 11 o'clock the next morning, the com-
> plainant asked his father and mother separately for a
> weight bench. His father said maybe, and later, when his
> mother said yes, but not for three months, complainant
> broke into tears. When his mother asked what was wrong,

complainant made the statement in question. We agree with
the trial court that these circumstances describe a continu-
ing level of stress arising from the assault that precluded
any possibility of fabrication. [*Ante*, pp 552-553.]

I disagree that these circumstances demonstrate a
level of continuing stress sufficient to satisfy the
threshold for admission of the complainant's state-
ment as an excited utterance. While profound hyste-
ria is not required, something more than unusual or
"extraordinary" behavior must be evident before one
can reasonably conclude that a hearsay declarant
spoke under what Wigmore called the "immediate and
uncontrolled domination of the senses . . . ." 6 Wig-
more, Evidence (Chadbourn rev), § 1747, p 195.[1] I
believe the fact that the complainant took a long bath
and paced for hours while slamming a fist into his
hand is indicative of a person deep in thought, reflect-
ing on the earlier assault. Moreover, the complainant
was able to calm himself enough to sleep for several
hours. Finally, when he did wake up, he asked his

---

[1] The classic statement of the reason underlying this exception is that
of Wigmore:

  This general principle is based on the experience that, under cer-
tain external circumstances of physical shock, a stress of nervous
excitement may be produced which stills the reflective faculties
and removes their control, so that the utterance which then occurs
is a spontaneous and sincere response to the actual sensations and
perceptions already produced by the external shock. Since this
utterance is made under the immediate and uncontrolled domina-
tion of the senses, and during the brief period when considerations
of self-interest could not have been brought fully to bear by rea-
soned reflection, the utterance may be taken as particularly trust-
worthy (or at least as lacking the usual grounds of untrustworthi-
ness), and thus as expressing the real tenor of the speaker's belief
as to the facts just observed by him; and may therefore be received
as testimony to those facts. *Id.*

parents to buy him a weight bench. This simple question is persuasive evidence of a reflective thought process: if the complainant could convince his parents to buy him a weight bench, he would no longer need to work out in the same establishment as the defendant. Thus, contrary to the majority, I believe these circumstances provide overwhelming proof of the complainant's reflective capacity.

I also believe that the majority grossly understates the importance of the ten-hour time lapse between the alleged event and hearsay statement in this case. The Court of Appeals found that, although the complainant was still under the stress of the assault, the "statement did not qualify as an excited utterance because . . . the statement was made after there was sufficient time to permit reflective thought." Unpublished opinion per curiam, decided July 11, 1995 (Docket No. 148757). The majority concludes that this reasoning is "flawed" because "[t]hough the time that passes between the event and the statement is an important factor to be considered in determining whether the declarant was still under the stress of the event when the statement was made, it is not dispositive." *Ante*, p 551.

While I agree that the Court of Appeals analysis was overly simplistic, I do not believe it can be said that its analysis was "flawed." Although not dispositive, temporal proximity is certainly the most important factor of the analysis, for, as time passes, the justification for the excited utterance exception disappears as the emotional excitement of the declarant subsides and his capacity for reflection revives. However, as Weinstein explains, "[P]hysical factors, such as shock, unconsciousness, or pain, may prolong the

period in which the risk of fabrication is reduced to an acceptable minimum." *Id.*, § 803.04[5], p 803-24. There being no evidence in the record that the complainant suffered from any of these factors, I am compelled to agree with the Court of Appeals that the statement was inadmissible because it was made after there was more than sufficient time to permit reflective thought. This is in accord with the case law of this state, from which today's ruling drastically departs. See *People v Gee*, 406 Mich 279; 278 NW2d 304 (1979); *People v Straight, supra; People v Creith*, 151 Mich App 217; 390 NW2d 234 (1986); *People v Petrella*, 124 Mich App 745; 336 NW2d 761 (1983).[2]

Also militating against the admissibility of the complainant's statement is the fact that the statement was made in response to his mother's persistent questioning. Like the question of elapsed time, whether a statement made in response to questioning should be excluded under MRE 803(2) depends on the circumstances of the questioning and whether it appears

---

[2] The prosecution cites several cases from other jurisdictions that have upheld as excited utterances statements made quite long after the startling event. However, in each of these cases the declarant possessed certain "physical factors, such as shock, unconsciousness or pain," which Weinstein states are a prerequisite for admission of an excited utterance after a significant lapse of time. See, e.g., *State v Starcevich*, 139 Ariz 378; 678 P2d 959 (1983) (a statement by a rape victim made approximately nine hours after the sexual assault was properly admitted where the victim was severely injured in the assault); *State v Crowhurst*, 470 A2d 1138 (RI, 1984) (a rape victim's statement three hours after an assault was properly admitted where the victim was crying, bruised, disheveled, and in shock); *Mills v State*, 626 SW2d 583 (Tex App, 1981) (a prosecutrix' statement was admissible as an excited utterance six to eight hours after a rape where the statement was made almost immediately after she had left the presence of the armed defendant). Today's ruling is beyond the outer fringe of excited utterance cases in terms of its admission of a statement made approximately ten hours after the startling event where there is no evidence of serious physical or emotional trauma.

that the statement was the result of reflective thought. McCormick, *supra*, § 297, p 857. As was stated in *Straight*:

> "Evidence that the statement was . . . made in response to an inquiry, while not justification for automatic exclusion, is an indication that the statement was the result of reflective thought, and where the time interval permitted such thought these factors might swing the balance in favor of exclusion." [*Id.*, p 426, n 6, quoting McCormick, *supra*, p 857.]

The record reflects the following scenario. Complainant returned home around 1:45 A.M., but seemed to have a hard time getting in the door. Once inside his mother asked, "Joel, what's wrong?" to which he replied, "Oh, mom, leave me alone." Moments later she asked, "Well, Joel, do you want to talk to me?" to which he responded, "No, I can't." A short time later she assured him that "[w]hen you want to talk, I'm here." The following morning, after complainant asked for the weight bench, his mother once again asked him, "what's wrong?" In response to this question complainant made the hearsay statement in issue, "Oh, mom, I had to be sucked off last night before I can [sic] even come home."

Had the complainant blurted out the statement immediately after returning home, I might agree, as the majority put it, that the "dam simply broke." *Ante*, p 554. However, this is not what happened. The complainant's mother, observing the complainant's apparent distress, began questioning him as soon as he got home. He was, however, sufficiently in control of himself to refuse to answer her questions. By the time he finally responded, he had had more than nine hours to formulate his eventual response to her per-

sistent questioning. His behavior during that time suggests overwhelmingly that he possessed the capacity to do so, and that his response was, therefore, the product not of the "uncontrolled domination of the senses," but rather of reflective thought.[3] Thus, I conclude that the statement did not possess sufficient

---

[3] The majority's attempt to distinguish *Straight* is unavailing: "Unlike the questioning in *Straight*, the mother's inquiries of the complainant when he arrived home and the following morning were not suggestive." *Ante*, p 553. However, our reversal in *Straight* was not predicated on the suggestiveness of the questioning, but, rather, on the one-month time lapse, and, as in the present case, the frequency of the mother's questioning. In fact, the mother's questioning in *Straight* was no more suggestive than in this case:

"*Q.* Could you tell us how this developed, who said what and when?

"*A.* First I started in on her about, '[R_____ (the child)], what is wrong with you? Why do you keep throwing up? Why do you keep waking up and shaking. Tell me what is wrong with you.'

"So she just, you know, kept on looking up at me really scared and she wouldn't say anything and I just looked over at [her father] and I said, '[G_____], you've got to do something with her. I can't find out what's wrong with her.' And so he looked at her and said, '[R_____], tell us what happened right now.' And that is when she come out and said something and I said, 'Did Bill do anything to you?,' and she said yes—do you want me to go ahead and say it?

"*Q.* That is right. We are all adults here, we want to hear it.

"*A.* She said, 'Yes, Bill put his fingers inside me,' and I said, 'What else did he do?,' and she said, 'he told [T_____ (another child)], to go get a fork so that he could eat me.' And [T_____] was downstairs when I came home that night so she said that [T_____] went and got a fork out of the cupboard so that he could eat [R_____].

"*Q.* Okay. Is that basically what she told you in front of your husband?

"*A.* Yes." [*People v Straight, supra*, p 421, n 1.]

The majority loses sight of the crucial question, which is whether the declarant was still under the stress of the event so that his statement could not *possibly* be the result of fabrication, intervening actions, or the exercise of choice or judgment. Whether the declarant in fact fabricated his statement, or whether he at least possessed the motive to fabricate, is irrelevant to the MRE 803(2) excited utterance determination.

indicia of reliability to justify its admission as an excited utterance under MRE 803(2).

II

I also disagree with the majority's conclusion that the admission of the complainant's statement was harmless error. The Court of Appeals concluded that the error was harmless because it was cumulative to the complainant's in-court testimony. The majority correctly points out that the fact that a statement is cumulative, standing alone, does not result in a finding of harmless error. Rather, error requires reversal only if it is prejudicial. *People v Mateo*, 453 Mich 203, 215; 551 NW2d 891 (1996). The prejudice inquiry "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." *Id.*, p 217.

In *People v Straight, supra,* the defendant was convicted of second-degree criminal sexual conduct involving a four-year-old girl. This Court held that the trial judge had erroneously permitted the parents of the four-year-old victim to testify under the excited utterance exception regarding statements made by the victim one month after the alleged assault. In evaluating the prejudicial effect of the improperly admitted hearsay, we stated:

> The admission of this evidence being erroneous, we must determine whether a miscarriage of justice has resulted. MCL 769.26; MSA 28.1096. Our inquiry is to the "effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos v United States*, 328 US 750, 764; 66 S Ct 1239; 90 L Ed 1557 (1946). To determine whether the defendant was so prejudiced that reversal is required, we evaluate the prejudicial effect of testimony in the light of other competent evidence. *People v Kregger*, 335 Mich

457; 56 NW2d 349 (1953). In light of the emphasis placed on this evidence by the prosecution, we cannot safely conclude that the error did not have substantial influence on the jury's result. Although the child testified at trial regarding the facts related by her parents, these facts were denied by the defendant. *When viewed as a one-to-one credibility contest between the child and defendant, the reinforcement provided by the people's hearsay evidence may have tipped the scales toward a guilty verdict.* In any event, upon review of the whole record, we conclude that the error was such that failure to grant the requested relief would be inconsistent with substantial justice. [*Straight, supra,* pp 427-428 (emphasis added).]

I believe that our reasoning in *Straight* applies with equal force to the present case. First, like *Straight,* this case came down to a one-against-one credibility contest, there being no corroborating evidence of the alleged sexual assault independent of the complainant's testimony. The majority concludes that the statement was merely cumulative because "the mother's testimony . . . was replete with evidence of the complainant's distress upon his arrival home." *Ante,* p 555. However, the statement was not offered to prove that the complainant was distressed when he arrived at home. Instead, it was offered to prove the truth of the matter asserted, that is, that the sexual assault actually occurred. The complainant's mother was not present and thus could not testify about the circumstances surrounding the alleged assault. Thus, the statement was not merely cumulative to the rest of her properly admitted in-court testimony.

Second, also as in *Straight,* the prosecution in the present case used the hearsay testimony to bolster

the complainant's credibility.[4] The majority concludes that the statement was merely corroborative of the complainant's in-court testimony because he "had already testified regarding the escalating threats and forced fellatio." *Ante*, p 555. However, it is well established that the rule of harmless error with respect to hearsay statements is in no way related to the availability of the hearsay declarant as a witness at trial. *People v Hallaway*, 389 Mich 265, 278; 205 NW2d 451 (1973); *People v Kregger, supra*. Rather, the harmless error rule is applied only in those instances where the out-of-court statement has no significant bearing on a disputed question of fact. *Hallaway, supra*, p 278.

---

[4] Michigan law has long proscribed the use of a prior consistent statement to bolster the credibility of a witness. As Justice BRENNAN wrote in *People v Hallaway*:

> Hearsay is defined as an extra-judicial statement which is offered for the purpose of proving the truth of the thing said. While some writers have suggested that the hearsay rule need not be applied to the extra-judicial statements of a declarant, who later testifies as a witness, this Court has not recognized such an exception to the hearsay rule. Of course, prior inconsistent statements of a witness can be shown for impeachment purposes. But this is not properly an exception to the hearsay rule. Prior inconsistent statements are not admissible to prove the truth of the thing said. They are offered, rather, to prove that the inconsistent statement was in fact made, irrespective of its truth, for the purpose of impeaching contrary testimony from the witness stand. *Where the prior extra-judicial statement of a witness agrees with his testimony, the out-of-court remark is self-serving, and is not generally permitted under any established exception to the hearsay rule.* [389 Mich 265, 275-276; 205 NW2d 451 (1973) (emphasis supplied); see also *Stewart v People*, 23 Mich 63 (1871).]

Where, as in the present case, the occurrence of the event described by the hearsay statement was a hotly contested issue of fact, the people should not have been permitted to bolster the testimony of their witness with his extrajudicial statement to his mother. *Hallaway, supra*, p 279; see also *People v Cunningham*, 398 Mich 514, 522; 248 NW2d 166 (1976). The admission of the complainant's prior consistent statement was prejudicial and constituted error requiring reversal. *Id.*

When viewed as a pure credibility contest, it strains reason to suggest that the complainant's hearsay statement had no significant bearing on the main disputed question of fact in this case—the occurrence or nonoccurrence of the alleged sexual assault. The majority's conclusion that "the defendant's theory, his denial of the threats and forced fellatio, was [not] eroded by admission of the statement," *ante*, p 555, discounts the sensationally prejudicial nature, as well as the likely effect on the jury, of a statement by a sixteen-year-old boy to his mother that "I had to be sucked off last night before I can [sic] even come home."[5] This graphically descriptive statement converted the case from a one-against-one credibility contest into a two-against-one contest, the second witness being the complainant's mother who, by sole virtue of her motherhood, took the stand cloaked with an aura of reliability that likely moved the jury to conclude that, if the complainant told his mother that the defendant assaulted him, then it must be true. The reinforcement provided by the people's hearsay evidence likely tipped the scales in favor of a guilty verdict, especially in light of the fact that excited utterance statements are likely to have greater evidentiary value to the trier of fact than in-court statements to the same effect. In holding that the excited utterance exception does not violate the federal Confrontation Clause, Chief Justice Rehnquist made this very point:

---

[5] The prosecutor conceded at oral argument that this was the single most extraordinary statement he had ever heard uttered in a criminal case.

> But those same factors that contribute to the statements' reliability cannot be recaptured even by later in-court testimony. A statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom. [*White v Illinois*, 502 US 346, 355-356; 112 S Ct 736; 116 L Ed 2d 848 (1992).]

Upon review of the entire record, I cannot safely conclude that complainant's statement did not have a substantial effect on the jury's decision. I believe the error to be of a kind that the failure to grant relief has resulted in a miscarriage of justice, and, thus, would reverse the defendant's conviction and remand for a new trial.

CAVANAGH and KELLY, JJ., concurred with BRICKLEY, J.