*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SHANE JEREMY HAWKINS,

        Defendant-Appellant.

UNPUBLISHED
January 17, 2019

No. 339020
Monroe Circuit Court
LC No. 16-243183-FH

Before: GLEICHER, P.J., and STEPHENS and O'BRIEN, JJ.

PER CURIAM.

A jury convicted defendant of two counts of third-degree criminal sexual conduct (CSC-III) (penetration by force or coercion of a victim 13 to 16 years of age), MCL 750.520d, and accosting, enticing, or soliciting a child for immoral purposes, MCL 750.145a. Defendant raises several challenges to the prosecutor's trial conduct, the adequacy of his defense representation, and to his sentencing. Although his trial was not perfect, we discern no error requiring reversal or a new trial. All agreed before sentencing, however, that defendant was a third habitual offender and he therefore should not have received the enhanced sentence of a fourth. We affirm defendant's convictions, but vacate his sentences and remand for resentencing.

## I. BACKGROUND

In the summer of 2016, 14-year-old BW spent a long weekend visiting her father's friend, defendant, and his family. The 32-year-old defendant lived with his wife Debi, 13-year-old son NH, 11-year-old daughter AH, and 3-year-old daughter KH. The home is a duplex and defendant's mother, Cheryl Hicks, lived in the other unit. Hicks had previously been BW's daycare provider and BW looked to Hicks as a fictive grandmother.

On the Saturday night of BW's visit, the family hosted a bonfire. It is possible that BW and NH snuck alcohol during the event, or were provided alcohol by defendant and Debi. BW indicated that defendant had consumed a significant amount of alcohol that night. By the end of the evening, only defendant and BW remained by the fire. They discussed defendant and Debi's rocky relationship. BW claimed that defendant commented on her age and said, "[F]our more years." Defendant testified that they also discussed BW's family life, a point that BW denied.

Specifically, BW's father is a long-haul trucker and is gone for extended stretches of time. BW's mother does not have custody and BW stays with a family friend, Vella Hall, while her father is away. BW has a close relationship with her adult sister, Kristi Wray, and looks to her as a mother. Defendant claimed that BW expressed how deeply she missed her father and stated that Kristi had been molested by either their father or their stepbrother.

After the bonfire, BW retired to the sofa in defendant's living room. BW described that AH sometimes slept on the living room chair during her visits, but that AH had returned to her bedroom on the night in question. Defendant asserted that AH was asleep on the chair that night and that he was never alone with BW in the living room. BW went into the kitchen to make a glass of chocolate milk while defendant ate a snack. BW described that defendant pushed her up against the wall, got very close to her, and made her uncomfortable. BW directed defendant to stop and she escaped to the living room.

Shortly thereafter, defendant followed BW. While BW sat on the couch, defendant stood in front of her and unbuckled his pants. Defendant prevented BW from moving away, forced her to lie down, and forced her pants and underwear down. BW accused defendant of penetrating her vagina with his finger, tongue, and penis. Defendant briefly left the room to find a towel and forced BW onto his lap when he returned.

The next day, BW told Debi that defendant "was a dog," but Debi did not know what BW meant. BW claimed that she spoke about the incident with Hicks and that Hicks believed her. According to BW, Hicks promised to take her to a clinic and get her a pregnancy test if she stayed a few days longer. As a result, BW tried to convince Hall to allow her to stay but Hall required BW to return so they could go camping. When questioned by the police, Hicks admitted that BW told her that defendant raped her. Hicks asserted that she did not believe BW, but offered that BW could sleep at her house instead of defendant's. BW declined the offer. Hicks further claimed that BW acted normally for the remainder of her visit, fueling Hicks's disbelief.

Several days later, while on a camping trip with Hall and some relatives, BW told Hall's sister that defendant had sexually assaulted her. BW also telephoned her mother and reported the incident. BW's mother, in turn, called BW's father, Kristi, and a cousin. Kristi came and got BW and drove her to a hospital for an examination. The hospital advised that it did not have a sexual assault nurse examiner on staff and in any event, that too much time had passed to secure evidence. Kristi then contacted local authorities to report the assault. Monroe County Sheriff's Detective Michael Boczar took the lead on the case. He conducted a child forensic interview of BW and interviewed defendant, Debi, Hicks, and NH. He ultimately found the evidence adequate to present the case to the prosecutor.

## II. PROSECUTORIAL MISCONDUCT

Through appointed counsel and in an in pro per supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4, defendant challenges the propriety of the prosecutor's conduct at trial. Defendant preserved only a portion of his challenges by raising timely and specific objections below. See *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). We review de novo defendant's preserved claims to determine if he was

denied a fair and impartial trial. *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004). We review his unpreserved challenges for plain error affecting his substantial rights. *Brown*, 294 Mich App at 382. Our role is to determine whether the prosecutor's improper conduct denied the defendant "a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). We review such claims on a case-by-case basis, considering the record as a whole and examining the prosecutor's statements in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010).

Defendant accurately asserts that the prosecutor improperly implied to the jury that he had been convicted of a theft crime in 2002. The charge for that offense, defendant accurately notes, was dismissed and even if it had resulted in a conviction, it would have been too old to be probative. Early in these proceedings, the prosecution filed a supplemental felony information that included a fourth habitual offender notification. The notification indicated that defendant had been convicted of larceny from a motor vehicle in 2002, and of two other felonies in 2003 and 2006. At trial, defendant took the stand to testify in his own defense. He therefore opened himself up to impeachment.

MRE 609(a)(2) permits a party to attack the credibility of a testifying criminal defendant with evidence that he or she has been convicted of a crime that "contained an element of theft," if "the court determines that the evidence has significant probative value on the issue of credibility" and "that the probative value of the evidence outweighs its prejudicial effect." The age of the conviction is relevant to the prejudicial/probative analysis. MRE 609(b). "Evidence of a conviction . . . is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date." MRE 609(c).

On cross-examination, the prosecutor asked defendant if he had been truthful on the stand; defendant indicated that he had. The prosecutor then asked defendant if he had been convicted in Lenawee County of a theft crime. Defendant replied that he had not, "that case was dismissed." The prosecutor continued:

> *Q*. So, you've been accused of being dishonest before?
>
> *A*. I've been accused of it before, yes, ma'am.
>
> *Q*. You weren't convicted in 2002?
>
> *A*. No, ma'am.

Defense counsel objected and the court held a sidebar discussion. The court then directed the prosecutor to continue and she asked the following question:

> *Q*. You were convicted of Larceny [from] a Motor Vehicle in 2002 in Adrian, correct?
>
> *A*. No. It was dismissed.

The court and the parties later determined that the supplemental felony information contained inaccurate information and a LEIN search confirmed that defendant had not been convicted of any offense in 2002.

This line of questioning was clearly inappropriate. "MRE 609 only applies to the use of past *convictions*; it does not address the use of past arrests that do not result in convictions for the purpose of showing a witness'[s] bias." *People v Layher*, 464 Mich 756, 771; 631 NW2d 281 (2001). Defendant's 2002 dismissed larceny charge was not admissible on that ground alone. Even if defendant had been convicted of larceny, the conviction would have been 15 years old, rendering it inadmissible under MRE 609(c).

However, the trial court already addressed this improper line of questioning and provided a curative instruction to the jury:

> [I]t has been researched and it has been discovered that [defendant] has not been convicted of and [sic] crime of Larceny from a Motor Vehicle or Larceny of a Motor Vehicle. So, anything that you heard with respect to that, you are to disregard it. He has not been convicted of that, so that should not enter into your deliberations in the least bit.

Both parties approved this instruction. Curative instructions are sufficient to remedy the prejudicial effect of most inappropriate statements made by the prosecutor. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Jurors are presumed to follow those instructions. *Id*. And a defendant who affirmatively approves a court's curative instruction waives any challenge on appeal. *Id*. at 233. Accordingly, although the prosecutor erred, defendant was not prejudiced and is not entitled to relief.

Defendant also contends that the prosecutor bolstered BW's credibility by injecting her religious beliefs into the trial. Specifically, BW testified that after she revealed the assault to Hicks, she accompanied Hicks on a shopping trip. The questioning continued:

> *Q*. Okay. Do you remember anything that you . . . purchased during that shopping trip with [Hicks]?
>
> *A*. Yeah, I actually have it on. I bought this cross necklace and it has faith on the side of it.
>
> *Q*. And why did you buy that when you were shopping?
>
> *A*. Because I needed God. I'm very religious and I feel like he gets you through tough times, so I just wanted it to be close to me at the cross [sic] for something that I could have.
>
> *Q*. And you bought that during your shopping trip?
>
> *A*. Yes, to a Walmart.
>
> *Q*. Okay. Did you tell anybody that you bought that?

*A.* [Hicks] knew that I bought it.

*Q.* And did you talk to her about why you bought it?

*A.* No.

The progression of this line of questioning suggests that the prosecutor knew what BW would say, understood it was improper, and posed the questions anyway. If the prosecutor merely sought to test BW's memory of events surrounding the incident, the prosecutor would have stopped the inquiry after learning that BW remembered what she purchased. It was completely irrelevant why BW chose to purchase a cross and was certain to elicit prohibited testimony about BW's religious beliefs. Compare *People v Leshaj*, 249 Mich App 417; 641 NW2d 872 (2002) (in which the CSC victim spontaneously testified that she opposed the defendant's sexual advances because of her religious beliefs, but then the prosecutor purposefully relied on that testimony during closing argument).

"No witness may be questioned in relation to his opinions on religion, either before or after he is sworn." MCL 600.1436. "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness'[s] credibility is impaired or enhanced." MRE 610. Asking a witness questions about their religious beliefs to bolster his or her credibility in a case that hinges on the credibility of the opposing witnesses generally is "unwarranted, prejudicial and constitute[s] reversible error". *Leshaj*, 249 Mich App at 422 (cleaned up).[1]

Although the prosecutor in this case did not directly question BW about her religious beliefs, she did inquire why BW purchased a cross, a question aimed at eliciting improper testimony. However, the prosecutor did not rely on BW's statement during closing argument. In fact, BW's religious beliefs were not mentioned again. Instead, the prosecutor analyzed BW's credibility versus that of Hicks, arguing that Hicks had motivation to lie and protect her son. Such a brief incursion into prohibited territory early in the trial does not warrant automatic relief. Rather, such brief impropriety could have been remedied by a curative instruction, had defendant raised a timely objection. Absent any showing of prejudice, we discern no plain error warranting relief.

In his in pro per brief, defendant contends that the prosecutor committed misconduct by failing to have a guardian or conservator appointed for BW and that the police erred by failing to employ "forensic protocol" when questioning BW. However, defendant supports his claim that BW should have been appointed a guardian or conservator on law pertaining to the filing of civil actions by minors through a conservator or next friend. These provisions do not mandate the appointment of a representative for a minor complainant in a criminal case.

---

[1] This opinion uses the new parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, Cleaning Up Quotations, 18 J App Pract & Process 143 (2017).

And defendant does not contend that Detective Boczar asked any inappropriate questions of BW or posed the questions in a leading way, only that the detective allowed BW's sister, rather than a parent, to approve of the interview. Although it might have been better practice to ensure that BW's actual guardian knew about the interview, there is no ground to exclude BW's testimony absent an irregularity in the interview itself.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant further contends that his appointed defense counsel provided ineffective assistance. Because an evidentiary hearing was not conducted in the trial court and this Court denied defendant's motion for remand, our review is limited to errors apparent on the existing record. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008).

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). " '[I]t has long been recognized that the right to counsel is the right to the effective assistance of counsel.' " *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984), quoting *McMann v Richardson*, 397 US 759, 777 n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970). In *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984), the United States Supreme Court held that a convicted defendant's claim of ineffective assistance of counsel includes two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." To establish the first component, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Solomonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). With respect to the prejudice prong, the defendant must demonstrate a reasonable probability that but for counsel's errors the result of the proceedings would have differed. *Id*. at 663-664. The defendant must overcome the strong presumptions that his "counsel's conduct falls within the wide range of professional assistance," and that his counsel's actions represented "sound trial strategy." *Strickland*, 466 US at 689.

Defendant first contends that his attorney should have objected when Detective Boczar vouched for the credibility of BW. On redirect examination of the detective, the prosecutor tested defendant's theory that BW made up the allegations to secure her father's attention. The prosecutor inquired regarding the forensic interview:

> *Q*. Do you attempt, based on the protocol, to think of other hypothesis of what . . . could be a reason she's disclosing this information or if there's a mistake or something to that effect?
>
> *A*. Yes. Part of the forensic interviewing is protocol for is [sic] alternative hypothesis, why did this happen, could there be other reasons why it happened . . . .
>
> * * *
>
> *A*. So, we're always thinking of different alternatives of why this happened, was it because a question wasn't asked right before it got reported to

the police, was it something else. So, you're always thinking during that interview with the child. What I do is try to prove that it didn't happen. If I can prove that it didn't happen because it might have happened because . . . the child was sick and there was, you know, they were tending to the child's needs because he was sick and some of his private parts or her private parts were touched but didn't come out like that, if I can't prove that it didn't happen, then there's a good possibility that it did.

*Q.* And did you do that with [BW]?

*A.* Yes.

*Q.* Okay. What is the whole purpose of having a free narrative and a question and clarify section in the protocol?

*A.* It's so that the child, he or she can explain what happened. They need to explain from the very beginning of that incident to the very end of it and what happened in between, there needs to be detail. . . . So, it's for them to explain and tell the whole story about what occurred.

\* \* \*

*Q.* And what's the purpose to clarify her story?

*A.* The clarification- -after she told her story from the start to the end, then I had some clarification questions for her, so that I know what she was talking about or I was challenging her also . . . to see is, you know, is she really telling me the truth here or is it something else. And I couldn't do that with her as far as have her showing me or portraying to me that she was not being truthful. The clarifications, questions . . . that I asked her and so forth with that, it seemed authentic to me.

One testifying witness may not comment on the credibility of another witness. *People v Douglas*, 496 Mich 557, 583; 852 NW2d 587 (2014); *People v Musser*, 494 Mich 337, 348-349; 835 NW2d 319 (2013); *Dobek*, 274 Mich App at 71. In *Douglas*, 496 Mich at 583, for example, the Michigan Supreme Court found improper investigator testimony that the child sex abuse victim's "allegations had been substantiated" and that, "based on the disclosures made at Care House, there was no indication that [the victim] was coached or being untruthful[.]" Detective Boczar's testimony crossed the line of propriety; he asserted that as he could not disprove the allegations by tripping up the victim, it was likely that the events did occur and that BW's story "seemed authentic." And defense counsel did not object.

To warrant relief, however, the failure of defense counsel to object must have resulted in prejudice. The improper testimony in this case was very brief and was rather mild. In *Douglas*, the Supreme Court found that a new trial was required, but the improper testimony in that case was overwhelming. Like this case, *Douglas* was a credibility contest with no physical evidence. See *id*. at 562-563. But the trial court in *Douglas* erroneously admitted hearsay evidence against the defendant. *Id*. at 576. And three separate witnesses vouched for the credibility of the five-

year-old victim (or disparaged the credibility of the defendant) in *Douglas*—a detective, a child protective services worker, and a child forensic interviewer. *Id*. at 563. Detective Boczar's testimony did not rise to the level of overwhelming the proper evidence. Rather, he described how he tried to disprove BW's allegations through strategic interview questions and then opined that her statements "seemed" authentic. The jury also heard from BW and from defendant and were able to independently assess the credibility of the witnesses. We therefore discern no ground to return this matter to the trial court.

Defendant further contends that his appointed attorney failed to disclose a fatal conflict of interest—that he had previously represented BW's father in unrelated criminal matters. A defendant's right to counsel includes the right to have an attorney who is not "burdened by an actual conflict of interest," a condition that "breaches the duty of loyalty." *Strickland*, 466 US at 692. The defendant "must establish that an actual conflict of interest adversely affected his lawyer's performance." *People v Smith*, 456 Mich 543, 556; 581 NW2d 654 (1998) (cleaned up). The defendant must show "that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Id*. at 557 (cleaned up).

Defendant relies on MRPC 1.7 to establish an actual conflict of interest. The rule provides that an attorney may not represent a client if "the representation . . . will be directly adverse to another client" or "if the representation . . . may be materially limited by the lawyer's responsibilities to another client or to a third party," unless the attorney notifies the client and secures the client's approval. *Id*. The prosecutor listed BW's father in her trial witness list but ultimately did not call him to the stand. Accepting as true that defense counsel had represented BW's father in the past, had the prosecutor presented this witness, defense counsel would have found himself in the compromised position of questioning a former client as an adverse witness. However, defendant has not presented any proof that defense counsel did in fact represent BW's father in prior unrelated criminal matters. There is no record indication that defense counsel would have been required to "intrud[e] into matters protected by the attorney-client privilege" with BW's father in order to effectively cross-examine him at defendant's trial. *United States v Provenzano*, 620 F2d 985, 1005 (CA 3, 1980). Ultimately, any claim that defense counsel operated under a conflict of interest is merely speculative or conjecture and defendant cannot establish the necessary prejudice to warrant relief.

Defendant next asserts that defense counsel should have presented an expert witness to testify regarding the credibility of the witnesses' testimony as there was no physical evidence to support BW's allegations. "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy," *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008), as are decisions whether to present expert testimony. *People v Solloway*, 316 Mich App 174, 189; 891 NW2d 255 (2016). The failure to call an expert witness amounts to ineffective assistance only if the decision deprives the defendant of a substantial defense. *Id*. "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (cleaned up).

Defendant was not deprived of a substantial defense. Defense counsel was able to effectively cross-examine the prosecution witnesses, including BW. Counsel focused on inconsistencies in BW's testimony and presented an alternative theory for BW's accusations—

that she was trying to get her father's attention. Moreover, the jury was notified that no physical evidence supported BW's claims. No expert testimony was required to further undermine BW's credibility and counsel was not ineffective for failing to seek such a witness.

Finally, defendant contends that his attorney was ineffective for allowing a biased juror to be seated. Some background information is required to explain defendant's challenge. Defendant and his wife had previously divorced and then remarried. During their separation, defendant became romantically involved with another woman, Laura, leading to the birth of his youngest daughter, KH. At the time of his criminal trial, defendant asserts that he and Laura were involved in a custody battle. Defendant contends that Juror No. 9 is the uncle of Laura's husband, KH's stepfather. The juror was biased, defendant contends, because defendant's imprisonment would result in Laura gaining full custody of their daughter.

There is no record support for defendant's challenge. Defendant sat with his attorney during voir dire. When asked, Juror No. 9 did not indicate that he knew defendant. And defendant does not claim that he advised defense counsel of the connection. Defense counsel could not have known that Juror No. 9 was in any way related to defendant or his ex-girlfriend and therefore had no ground to challenge his placement on the jury. Moreover, defendant has not presented any proof that Juror No. 9 is actually related to Laura's new husband or if he is, that he knew of defendant's connection to his nephew's wife's custody battle. Absent any proof of bias, defendant cannot establish that he was prejudiced by any potential error in this regard.

## IV. SENTENCING

Although defendant is not entitled to a new trial, he entitled to a remand for resentencing. During the trial, the prosecutor conceded that the supplemental felony information erroneously classified defendant as a fourth habitual offender, rather than a third. A different prosecutor attended defendant's sentencing hearing. Despite that defendant was represented by his trial attorney, counsel did not object to his classification as a fourth habitual offender in the sentencing information report. The sentencing judge, who also presided at trial, then enhanced defendant's sentence as a fourth habitual offender. This was error.

MCL 769.34(10) provides, "If a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence." Defendant's minimum sentence of 144 months is within the corrected minimum sentencing guidelines range of 87 to 217 months. However, the court relied upon inaccurate information in fashioning defendant's sentence, i.e., that he was a fourth habitual rather than third habitual offender. Accordingly, we must vacate defendant's sentences and remand for resentencing based on accurate information.

We affirm defendant's convictions, but vacate his sentences and remand for resentencing. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens
/s/ Colleen A. O'Brien