*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LEO DUWAYNE ACKLEY, also known as LEO DUANE ACKLEY JR, also known as LEO DUWAYNE ACKLEY, II,

        Defendant-Appellant.

FOR PUBLICATION
March 25, 2021
9:05 a.m.

No. 336063
Calhoun Circuit Court
LC No. 2011-003642-FC

ON REMAND

Before: STEPHENS, P.J., and SHAPIRO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant, Leo Duwayne Ackley, appeals by right his convictions by a jury of first-degree child abuse, MCL 750.136b(2), and first-degree felony-murder, MCL 750.136(1)(b). Defendant's convictions arise out of the death of 3 ½ year-old "B", the younger of two daughters of defendant's girlfriend. This matter returns to us on remand from our Supreme Court. We again affirm.

## I. BACKGROUND

This is not the first time this matter has come before us. Defendant was first convicted of the above offenses by a jury in 2012. Our Supreme Court ultimately granted defendant a new trial "because of his counsel's constitutionally ineffective failure to investigate adequately and to attempt to secure appropriate expert assistance in the preparation and presentation of his defense." *People v Ackley* (*Ackley I*), 497 Mich 381, 397-398; 870 NW2d 858 (2015). Defendant was retried and again convicted. In his initial appeal from that conviction, we set forth the following summary of the evidence and procedure:

Defendant was living with B's mother, who he was dating at the time, and B's 6-year-old sister. He cared for both girls while their mother was at work.

-1-

According to the mother, B developed some health and behavior concerns when defendant moved in, including unexplained bruising and regression in toilet training. Nevertheless, she testified that on the morning of July 28, 2011, B appeared to be in good health, alert, and talking. However, B had fallen from her bike and fallen from a trampoline a few days previously, which was not an uncommon occurrence. The previous day, B's temperature was approximately 100 degrees and she threw up during dinner.

When B's mother came home for lunch, defendant reported that B was upstairs not feeling well; according to the mother, B was apparently asleep but restless, with her head at the foot of the bed. B and her sister shared a room, and their beds were placed about a foot apart from one another. Defendant informed police officers that he discovered B on the floor, next to the bed, with her face down. He found her limp, so he initially tried to run water over her, but then drove her and her sister to his mother's house. He stated that he did not call 911 because he did not have a phone, but rather shared one with B's mother. Defendant's mother called 911 and initially decided to drive B to the hospital herself, but became too "shook up" to continue because B was foaming at the mouth.

When the EMTs and first responders arrived, B appeared to be breathing but was unresponsive and appeared to be unconscious. There appeared to be a bruise along the child's jawbone from the center toward the left. B was transferred to the pediatric ICU at the hospital, where she was pronounced brain dead the next morning. Witnesses testified to defendant appearing calm throughout the events. Defendant and B's mother drove home together. She testified that he said, "I'm going to prison" to her, and when she asked why, he replied with "They think I did something to our daughter."

Numerous doctors testified. Dr. Douglas McDonnell testified that B was unresponsive when she arrived and that her white blood cell count was abnormally high, which could result from infection, dehydration, or trauma. B had a subdural hematoma, cerebral edema, and suffered a hypoxic ischemic injury, leading to herniation of the brain, causing brain death. Dr. Joyce DeJong performed the autopsy and came to the conclusion that in her opinion the manner of death was homicide. Dr. DeJong based the opinion, in part on the fact that the child was asymptomatic for several days prior to her death and that it was more probable that the brain bleed resulted from a blow to the head which was consistent with an immediate onset of symptoms and death. In other words, the bleeding around the brain happened at the same time, because the bleeding would require a blow to the head and it would be exceptionally unusual for a child to sustain a lethal brain injury for several days without symptoms and then die.

Dr. Philip Ptacin, who had been B's doctor since early infancy, said she was anemic. B's test for thyroid problems were normal and he saw nothing that would cause concern and ultimately lead to her death. Dr. Stephen Guertin, who was qualified as an expert in the areas of child abuse, pediatrics, and pediatric intensive care, opined that B had suffered from abuse. Dr. Ljubisa Dragovic, who was

qualified in the fields of forensic pathology and neuropathology, opined that the subdural hematoma B suffered did not occur on July 28 and was in fact a week old. [*People v Ackley* (*Ackley II*), unpublished per curiam opinion of the Court of Appeals, released August 2, 2018 (Docket No. 336063), unpub op at pp 1-2.]

On appeal, our Supreme Court vacated "in part" our judgment and remanded "for reconsideration . . . of the expert testimony presented at trial in light of *McFarlane*." *People v Ackley* (*Ackley III*), ___ Mich ___, ___; 950 NW2d 47 (2020).

## II.  ISSUES ON REMAND

Our Supreme Court did not clarify exactly what it meant by "in light of *McFarlane*." In *People v McFarlane* (*McFarlane II*), 505 Mich 1059; 943 NW2d 84 (2020), our Supreme Court only denied leave to appeal. We therefore infer[1] that our Supreme Court must have intended to refer to this Court's opinion in *People v McFarlane* (*McFarlane I*), 325 Mich App 507; 926 NW2d 339 (2018), which was approved for publication five days after our prior opinion in this matter was released; and further that our Supreme Court must have implicitly adopted this Court's reasoning in *McFarlane I*.

The relevant[2] issue before this Court in *McFarlane I* was whether medical expert testimony invaded the province of the jury by referencing accepted medical terminology that might be misunderstood by laypersons as conveying emotional or legally-conclusory connotations. See *McFarlane I*, 325 Mich App at 523. We are constrained to conclude that our Supreme Court has,

---

[1] Peremptory orders from our Supreme Court constitute binding precedent to the extent they can be comprehended, even if that comprehension must be achieved by seeking out and analyzing other opinions. *Woodring v Phoenix Ins Co*, 325 Mich App 108, 115; 923 NW2d 607 (2018). See also footnote 2, *infra*.

[2] In *McFarlane II*, Justice MARKMAN, joined by Justice ZAHRA; and Justice CAVANAGH, joined by Chief Justice MCCORMICK, each concurred, and each either implicitly or explicitly indicated that the only issue from *McFarlane I* with which they were concerned was the "abusive head trauma" testimony. *McFarlane II*, 505 Mich at __ (slip op at pp 1-2) (MARKMAN, J.); *McFarlane II*, 505 Mich at __ (slip op at p 4) (CAVANAGH, J). Thus, four out of seven Justices, in other words, a majority, agreed that the pertinent issue from *McFarlane I* was the issue of an expert using the term "abusive head trauma" in the expert's testimony. In cases where there is no majority opinion, any proposition or reasoning agreed to by a majority of the Justices, in any combination, is binding precedent as to that narrow point of agreement. See *People v Anderson*, 389 Mich 155, 170-171; 205 NW2d 461 (1973), overruled in part on other grounds in *People v Hickman*, 470 Mich 602; 684 NW2d 267 (2004); see also *Marks v United States*, 430 US 188, 193; 97 S Ct 990; 51 L Ed 2d 260 (1977). Thus, based on a reading of the two concurrences in *McFarlane II* (signed by a total of four Justices) and *Ackley II*, we conclude that our Supreme Court adopted the reasoning from *McFarlane I*, but only to the extent *McFarlane I* addressed the propriety of medical experts using the term "abusive head trauma" in their testimonies. In other words, although *McFarlane I* involved other issues, we conclude that we are not compelled to address those issues today.

by necessary implication, adopted a *per se* rule that the diagnostic term "abusive head trauma" does indeed invade the province of the jury when used in cases involving allegations of abuse, even if it is medically possible to determine that a particular injury was non-accidentally inflicted and the term constitutes a formal diagnosis recognized in the medical community; use of the word thus automatically constitutes plain error. See *id*. at 521-525. Because this is a case involving allegations of abuse, and because experts testified about "abusive head trauma" and "abuse," we are constrained to conclude that plain error occurred. The issue before us, therefore, is narrow: whether the per-se plainly erroneous use of the words "abuse" or "abusive head trauma" by medical experts at defendant's second trial was so prejudicial that it deprived defendant of a fair trial. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Conversely, however, *McFarlane I* accepted that "abusive head trauma" was, in itself, an accepted medical diagnosis despite its less-than-universal acceptance within the medical community. *Id*. at 520-523. As noted, our Supreme Court only vacated our judgment "in part," implicitly on the basis of the portion of *McFarlane I* addressing the propriety of expert testimony including the word "abuse." Consequently, to the extent defendant repeats arguments made when last before this Court to the effect that "abusive head trauma" is "junk science" contrary to the trial courts' gatekeeping function,[3] that issue remains final and is not before us. Similarly, the other issues raised previously, including claims of prosecutorial misconduct, ineffective assistance of counsel, challenges to expert qualifications, and other evidentiary concerns, are also final and not before us.

Finally, our review for harmlessness is guided to some extent by the fact that this case was retried—and the experts' testimonies were provided—without the benefit of either *McFarlane I* or *McFarlane II*. A deliberately or intentionally created error may constitute an affront to the integrity of the proceedings that precludes a finding of harmlessness irrespective of the error's practical effect on the outcome. See *People v Robinson*, 386 Mich 551, 562-564; 194 NW2d 709 (1972). Under the circumstances, we find no indication of bad faith in this matter. However, in the future, the bench and bar must be mindful of any impermissible words used by experts; and experts should be cautioned that some words may be accepted medical terminology but unacceptable in a Michigan courtroom.

## III. STANDARD OF REVIEW

As discussed, any use of the word "abuse" in the context of a medical diagnosis, irrespective of whether that is in fact an accepted medical diagnosis, constitutes plain error in a criminal proceeding involving charges of abuse. "However, a plain error will not warrant relief unless the defendant demonstrates that the error affected the outcome of the lower court proceedings." *McFarlane I*, 325 Mich App at 525. The issue before us is limited to whether expert testimony involving the word "abuse" affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). We consider the entire record to determine whether

---

[3] See *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008); *Chapin v A & L Parts, Inc*, 274 Mich App 122, 135-140; 732 NW2d 578 (2007) (DAVIS, J).

erroneously-admitted evidence was prejudicial "in light of the weight and strength of the untainted evidence." *People v Smith*, 456 Mich 543, 555; 581 NW2d 654 (1998) (quotation marks omitted).

## IV.  ANALYSIS

We emphasize at the outset that much of defendant's argument involves matters not before us, particularly whether "abusive head trauma" has any medical or scientific validity, either at all or as applied to non-infant children.  The issue before us is whether the use of a word forbidden because of its emotional and suggestive connotations deprived this defendant of a fair trial under the circumstances and in the context of this case; not whether any of the prosecution's experts made an incorrect, impermissible, or inappropriate diagnosis.  We are not here to revisit the question of whether it is medically possible to make a reliable, scientifically valid diagnosis that a particular injury was sustained because of something other than an accident.  We are likewise not here to conduct our own assessment of what actually occurred in this matter.

Furthermore, experts are permitted to draw and testify to conclusions that encompass a question to be decided by the jury, so long as the expert does not purport—or, importantly for this matter, even appear to purport—to draw a legal conclusion.  *McFarlane I*, 325 Mich App at 518-519.  Thus, where it is possible to draw a medical diagnosis based on a physical examination, as opposed to a complainant's self-reporting, an expert is fully permitted to testify to an opinion that a particular injury was not accidentally self-inflicted.  See *id*. at 522-523.  The expert may not call that manner of injury "abuse," because, even if that is a term used in the medical community, it is also a legal conclusion and would be understood by laypersons to connote something different from what another doctor might understand.  See *id*. at 523.  Thus, much of defendant's argument misses the point: nothing in *McFarlane I* made it improper for any of the prosecution's experts to testify that, in their opinion, B did not sustain her injuries by accident or self-directed misadventure.  Rather, the experts were prohibited from characterizing the non-accidental way in which those injuries were sustained as "abuse" or "abusive."

In other words, our review for prejudice is not based on what outcome might have ensued if the prosecution's experts had not opined that B suffered non-accidental injuries, but rather what might have ensued if the prosecution's experts had phrased their opinions using less emotionally- and legally-suggestive terminology.  Defendant's contentions to the contrary notwithstanding, there is nothing inherently forbidden about a medical expert testifying that a particular injury was unlikely or impossible to have been sustained accidentally.

As defendant points out, there were no eyewitnesses to the events that resulted in B's injuries, and defendant consistently denied harming B.  Nevertheless, even without the use of improper terminology, the prosecution's experts still could have properly testified to the extent of B's injuries, that B's injuries had been inflicted rather than accidental, and that some of B's injuries were sustained before the day of the incident.  The jury still would have learned that although B might have been somewhat accident-prone, B's mother had noticed concerning physical changes in B—including bruising more easily and frequently, difficulty potty-training with frequent accidents, and picky eating—that seemed to correlate with defendant moving in.  The jury would also have still learned that defendant spontaneously volunteered his belief that he was going to prison after B's death.  In other words, for the most part, the *substance* of the experts' testimonies

would have been conveyed to the jury in any event, and thus the other non-scientific evidence would still have been considered in that context.[4]

Dr. Stephen Guertin testified that it would be concerning if a child who had been developing normally and had no history of bruising easily suddenly began regressing in her toilet training and showing bruises. Furthermore, he testified that there were photos of the child showing bruising in the neck area, which was "usually a very protected area" and "not an area that is ordinarily harmed accidentally." He also explained that the neck area was soft and thus exceptionally difficult to bruise. He did not "know of any activity that you would do that would cause that" accidentally. His testimony explained that the linear bruising on the child's buttocks would be consistent with a doubled-over cord or belt, and one was shown in one of the photographs he reviewed. He further emphasized that the child began showing these symptoms contemporaneously with defendant moving in. He explained that multiple areas of significant bruising to the child's head were revealed at the autopsy, and such bruises would normally be covered by hair. He noted that the bleeding inside the child's skull and in her eyes would only occur under "extremely rare situations." There were "multiple impact sites," significant force would have been necessary to cause the injuries, and the injuries themselves were inconsistent with either an accidental fall from a bed or simply being found face-down. He also opined that the kind of head injuries suffered would "essentially 100 percent of the time" result in obvious symptoms of distress immediately after the injury, with no "lucid interval." He emphasized that a fall from a bed simply could not generate the force necessary to cause this kind of serious head injury. Thus, although Dr. Guertin also improperly opined that B had suffered abuse, Dr. Guertin provided proper factual expert testimony that allowed no room for any doubt that B's injuries had not been sustained accidentally.

Dr. Douglas McDonnell, the emergency room physician who initially treated B, testified that he believed B had a closed-head injury, and he opined that the bruising he observed on B's neck was not the kind of bruising that might be sustained if someone had tried to force B's mouth open to administer CPR while in a seizure. Thus, Dr. McDonnell's testimony further supported the conclusion that B's bruising was not accidentally sustained. Dr. Tammy Graves was one of the doctors who subsequently treated B, and she was the doctor who ultimately pronounced B to be brain-dead. She observed that B had suffered multiple sites of bleeding and swelling that had caused the oxygen supply to her brain to be cut off. She explained that in her experience, B's combination of injuries and other physical findings were not consistent with—and could not be explained by—a short accidental fall. She also opined that B had no disease, illness, or medication

---

[4] We decline to consider defendant's arguments pertaining to Dr. Rudolph Castellani, because he did not testify at trial, so any use of the word "abuse" by Dr. Castellani could not possibly have infringed upon the province of the trier of fact. The defense brought up a report from Dr. Castellani during cross-examination of Dr. Joyce DeJong, but because any error in doing so was created by defendant, it cannot be grounds for appellate relief. See *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000).

that would cause her injuries. Again, the jury was properly informed that it was medically improbable or impossible that B accidentally caused her injuries by herself.[5]

Dr. Jon Walsh was a trauma surgeon who treated B upon B's transfer from the emergency room to the hospital. His initial assessment suggested an underlying brain injury, so B was given a CAT scan, which revealed blood around her brain. He stated that the blood indicated "some sort of force applied to the head that resulted in a rupturing of some small blood vessels." He stated that in his more than thirty years of experience as a trauma surgeon, he had never seen a child sustain those kinds of injuries from a fall from a bed, although it was conceivable that tripping and falling on concrete could cause that kind of bleeding. Dr. Walsh opined that from what he could see, it was "difficult to say" whether B's injuries were accidental or inflicted. Nevertheless, he opined that it "would not be typical" to sustain her injuries from a two-foot fall onto carpet. He testified that he would expect to see signs of external bruising, but he conceded that he had not reviewed B's autopsy, nor was he involved in her care after the first day. Dr. Walsh did not use the word "abuse." Thus, his testimony, while not definitive, again properly conveyed to the jury that an accidental fall from a bed was unlikely to have caused B's injuries.

Dr. Joyce DeJong, a forensic pathologist, performed B's autopsy. Dr. DeJong found B's manner of death to be homicide; the alternatives being suicide, accident, natural, or indeterminate. Her finding was based not only on the physical examination, but from reviewing any other available information and records. She testified that she had been immediately concerned about B's injuries at the time of the exam, even though she did not yet have B's medical records. During her testimony, she pointed out numerous bruises depicted on photographs of B's body; she explained that it was expected that children would have some bruises in some places, but the bruises on B's body were more numerous and in unusual locations. Although it was possible that any one of those bruises could have been sustained accidentally, their totality was unlikely to have been accidental. Dr. DeJong found nothing unusual inside B's chest, abdomen, or neck. However, B had numerous internal and external injuries from her neck up, which she pointed out on photographs. Dr. DeJong opined that there was no indication that B had any disease or medication that would cause her injuries; rather, her "death was caused by blunt force injuries to her head." She explained that it was possible for someone to fall, hit their head, and sustain injuries; however, it was extremely unusual for a child to sustain serious injury from a fall of less than three to four feet, let alone sustain a lethal injury. Furthermore, it would be "very rare" for a child who sustained this kind of lethal head injury to function normally for any time after the injury occurred. She also noted that it was unusual to sustain a bruise to the top of one's head, and that none of the injuries could be considered in isolation from the others. She concluded that, in totality, B's injuries were indicative of being volitionally inflicted by someone else, probably an adult. Again, Dr. DeJong's

---

[5] The term "abusive head trauma" was raised for the first time during Dr. Graves's testimony by the defense on cross-examination. Indeed, although Dr. Graves used the word "trauma" during direct examination, she did not use any variation on the word "abuse" at all during direct examination. To the extent there was any error regarding the word "abuse" during Dr. Graves's testimony, any such error was attributable to defendant and, possibly absent a claim of ineffective assistance of counsel, not grounds for relief. See *Carter*, 462 Mich at 214-216.

testimony was proper, and it conveyed to the jury that B was unlikely to have been injured accidentally.

Dr. Michelle Halley was one of the doctors involved in the trauma team that attended B upon her transfer from the emergency room. She explained that a CAT scan was performed, B was found to have blood collection along her brain, and B had hemorrhaging in her eyes. Dr. Halley opined that a fall from a bed onto carpet could not have caused B's injuries, nor would they have been caused by anything else in the minimal history B's mother provided. She further opined that, based on the severity of B's injuries, she would have been immediately symptomatic. Dr. Halley opined that B's "injury is consistent with a shaking injury and that was the cause of her death" and that B was a victim of abuse. Clearly, the use of the word "abuse" was error. However, we do not find error in Dr. Halley's opinion that B's injuries were "consistent with a shaking injury." Unlike Dr. Guertin's testimony, which was replete with extensive explanations of how medically improbable it would be to accidentally sustain the kind of injuries found on B, Dr. Halley's opinion of abuse was largely conclusory. However, her testimony was also relatively brief, and it occurred after the jury had already been provided with extensive testimony setting forth why B's injuries were highly likely to have been intentionally inflicted.

Dr. Philip Ptacin was B's regular family doctor from the time of her infancy. He testified that B's speech was delayed; and she had been brought in for hair loss and a scalp rash at one point, and an ensuing blood test was "essentially normal" but "mildly anemic." B was specifically tested for thyroid issues, but her thyroid was found to be normal. He testified that he understood B to have died of a head injury, and in his opinion, nothing about her mild anemia or normal thyroid would cause such a death. He testified that he thought B should have been potty-trained by her age, and he was concerned that she was not; however, although he referred B's mother to parenting classes, he did not suspect that B was being abused.

Dr. Ljubisa Dragovic testified for the defense. He opined that the bleeding injury around B's brain was about a week old and in the process of healing. He agreed that a blunt force trauma was "part of the process that resulted eventually in [B's] death," but that there was only one such "significant injury." Nevertheless, he stated that he "may agree" with a conclusion that B was abused if a "plausible mechanism that supports that" could be shown, and he saw no supporting evidence. He emphasized that a three-month-old infant would be different because an infant was immobile and necessarily in the care of someone, whereas a child of B's age "is running around all the time" with ample opportunity to sustain accidental injuries. Dr. Dragovic's estimation of the age of the bleeding injury was based on examining tissue samples taken under a microscope, and on cross-examination, Dr. Dragovic admitted that there were limits to how precisely the age of the injury could be determined, and it was pointed out that B was declared brain-dead four days after B was found unresponsive. Furthermore, Dr. Dragovic discounted reports from the police that B had bruising to her neck before she was placed in a collar because there was no photographic documentation of any such bruising. His report concluded that B's head struck an "unyielding surface," and he conceded that he could not rule out B having been pushed or thrown.

Thus, the overwhelming majority of the prosecution's expert witnesses provided concrete, permissible testimony to the effect that B sustained drastic injuries that either could not have been accidental or self-inflicted, or were highly unlikely to have been accidental or self-inflicted. Not all of them used the word "abuse," or at least did not do so on direct examination. Dr. Halley's

diagnosis of abuse was essentially pure opinion and thus the most erroneous; however, it was also a single reference during brief testimony toward the end of the prosecution's case-in-chief. We are not persuaded it had any effect on the outcome of the proceedings. Dr. Guertin made extensive references to "abuse" during his testimony. However, his testimony also provided extensive explanations of why defendant's theory of accidental injury was implausible to impossible. Furthermore, the prosecution's closing argument mostly focused on defendant's own conduct as established by lay witnesses, arguing that defendant's conduct was consistent with a person who injured B. The prosecution also emphasized that the lay witnesses saw bruising on B's neck before they put her in a collar. To the extent the prosecution focused on expert testimony, it was a relatively brief discussion to drive home the point that B's injuries were extremely severe and therefore inconsistent with an accidental fall. In the prosecutor's words, "the best evidence is the Defendant himself." We are again not persuaded that, in context, the use of the term "abuse" by some of the prosecution's experts made any difference to the outcome in light of the overwhelming other evidence of defendant's guilt. See *McFarlane I*, 32 Mich App at 526-527.

## V. CONCLUSION

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro
/s/ Amy Ronayne Krause