*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* R. J. WIGGINS, Minor.

UNPUBLISHED
August 18, 2022

No. 359938
Midland Circuit Court
Family Division
LC No. 20-005152-NA

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and GARRETT, JJ.

PER CURIAM.

Respondent was homeless, had a lengthy criminal history, and rarely saw his son, RW, when RW's mother violated a safety plan with CPS by using illicit drugs and allowing her violent boyfriend into RW's home. The Department of Health and Human Services filed a petition to remove RW from his mother's custody and included allegations against respondent because his parental rights to two other children had already been terminated in prior proceedings. The Department was not able to maintain stable communication with respondent for much of the case because of his lack of involvement, lack of communication, and itinerant residency. The trial court ultimately terminated respondent's parental rights to RW.

Respondent now appeals, arguing that the amended petition lacked sufficient allegations for the trial court to authorize it, his trial counsel was ineffective, and the Department failed to make reasonable efforts to reunify him with RW. We affirm.

## I. BACKGROUND

RW lived in a home with his sister (who is not related to respondent) and their mother when this case began. Respondent barely had any contact with RW or his mother and would only see RW, at most, a few times each year. Respondent and RW's mother both had a prior history of CPS investigations, and RW's mother had agreed to safety plans that she would not use drugs, would not allow drugs or anyone suspected of using drugs into her home, and that her boyfriend, who had previously assaulted RW's mother and RW's sister, should not stay in the home. RW's mother violated all of those provisions, and the Department filed a petition in February 2020 to remove RW from his mother's custody based on that incident. That petition alleged that there

-1-

were statutory grounds to take jurisdiction over RW and, relative to respondent, alleged that respondent's parental rights to two children were terminated and addressed his criminal history. The petition, however, did not contain any allegations about respondent's treatment of RW.

The trial court held a preliminary hearing two days after the petition was filed. A Children's-Protective-Services investigator testified that the Department did not have much contact with respondent in the past, his whereabouts were unknown, and that he did not provide much support to his children. The investigator also testified about the assaults committed by RW's mother's boyfriend, RW's mother's violation of the safety plans, and RW's mother's use of illegal drugs. However, the investigator admitted when questioned on cross examination by respondent's attorney—Courtney Thom—that the petition did not contain any allegations about respondent failing to provide for RW. The prosecutor acknowledged that the petition did not contain any direct allegations against respondent, but argued that the trial court should still authorize the petition. Thom left the decision up to the trial court because she had not had any contact with respondent. The trial court authorized the petition.

The Department filed an amended petition about one month later. The amended petition contained the same allegations as the original petition, but added allegations about the Department's problems communicating with respondent and an incident during which he appeared at the Department's office asking for "personal paperwork" that the Department eventually gave to him. The amended petition did not contain any allegations about respondent's care for RW. The trial court also authorized the amended petition.

Respondent had a copy of the original petition in early March 2020, but he remained uninvolved with the case for the next several months. The trial court held an adjudication trial that respondent did not attend. RW's mother testified about the matters that led to this case; she also testified that it had been "over a year" since she last had contact with respondent and he saw RW. The Children's-Protective-Services investigator also testified. She testified that she was unable to contact respondent despite repeated attempts to do so and concluded that "[t]here is no evidence that [respondent] has provided care and custody" to RW. The trial court took jurisdiction over RW following trial in August 2020 and created a service plan for respondent that same month. Three months later, the trial court authorized a petition to remove RW and his sister from their mother's home. That petition added allegations that the Department could not locate respondent and the address they had on file for him was uninhabitable.

Respondent never engaged with the case service plan the Department created for him, and Thom did not have any contact with respondent until at least May 2021. During that time, Thom regularly cross-examined witnesses and advocated for respondent's parental rights. Nevertheless, due to respondent's poor communication with the Department and his lack of compliance with his service plan, the Department filed a petition to terminate respondent's parental rights.[1] That petition added allegations that respondent failed to participate in his service plan, barely contacted the Department throughout this case, did not have stable housing or income, and termination of respondent's parental rights was in RW's best interests. Respondent was in the court room the day

---

[1] RW's mother relinquished her parental rights.

of the termination hearing (just the third hearing he would have been present for), but he left before the hearing began without explanation.

As the termination hearing began, Thom assented to the admission of the "Forensic Fluids lab results" and similarly did not object to the trial court taking judicial notice of the two prior cases in which respondent's parental rights were terminated. Thom also stated the following regarding those files:

> If I may? I – I would like to state on the record, and I – I believe I did bring this to the Court's attention at the very beginning of the case when I was assigned to [respondent], that I actually did participate in those prior cases as the guardian ad litem for his children. For [TM] and [DL], in those prior cases of which the Court is taking judicial notice of at this point. I will say that I don't believe that that [sic] has caused me to proceed in any different fashion or represent [respondent] in any different way than I would any other client. But, I wanted to make sure that that [sic] was placed on the record.

Nobody objected to Thom representing respondent and the trial court took judicial notice of those files.

Foster-care-worker Stephanie White testified at the hearing. According to White, proceedings were initiated against respondent in this case because he did not have proper housing and he failed to provide for RW. She extensively testified about respondent's communication issues with the Department. Respondent only contacted the Department three times before the adjudication and White consistently attempted to contact respondent from August 2020 through October 2021, although she lacked records to confirm her efforts from December 2020 to June 2021 because she got a new phone. White did not receive any communication from respondent from March 21, 2021 to June 1, 2021, at which point respondent asked for a meeting with White that he ultimately cancelled. Respondent then contacted White in October 2021 and she finally met him for the first time in mid-October. White and respondent met twice in October; the only communication White had with respondent after those meetings was when he asked her for help with housing (which she provided) and to ask the court date for the termination hearing.

Respondent took drug tests at both of the October meetings with White; both drug screens were positive for controlled substances, which White said was consistent with his substance-abuse issues in his prior terminations. White additionally testified that, as far as she knew, respondent was homeless and he reported that he was employed through a friend, but she had not been able to verify that claim. White also testified that she did not believe respondent had seen RW since at least "the summer of 2020," respondent's parenting time had been suspended the entirety of this case, and respondent only saw RW for holidays and his birthday. White recommended terminating respondent's parental rights because he had not engaged in any services, he lacked suitable housing, he already had an extensive Children-Protective-Services history, and RW was thriving in his current placement and they were willing to adopt him.

Following White's testimony, the attorneys made their closing arguments. Thom argued, in full:

-3-

I would simply ask that you not grant the termination at this time. It has taken [respondent] a little while to seem to want to get involved, however, the more recent contact seems to be – been more frequent. He – he finally made it to his face-to-face meetings with Ms. White and has indicated that – to her, that he wants to do whatever needs to be done to get his son back. So, I would ask that he be given an opportunity at this stage to – now that he's engaged somewhat with Ms. White, to prove himself to the Court through actual participation. To have a chance to get the referrals done and give him an opportunity to participate in those services at this at this [sic] time. Thank you.

The trial court then made its factual findings. The trial court began by addressing respondent's presence and subsequent absence from the termination hearing:

[Respondent] did appear for the hearing, was given an opportunity to speak in private with his attorney, and following that discussion, he left the building. Frankly, and did not appear to continue on with the proceeding, nor did he reach out to any of my staff to inquire if the matter could be set over, or if there was anything else that could be done. He clearly – it is believed he left on his own volition . . . .

The trial court then addressed White's testimony, concluding, "I don't know what more Ms. White could have done to try to engage [respondent] here to ask him to participate in these proceedings and to become a part of [RW's] life." The trial court also stated that

[Respondent and RW] were represented by vary [sic] able and competent legal counsel, including Courtney Thom for [respondent], who argued the best that she could on behalf of her client. But, the Court does recognize there's not much an attorney can do to effectively advocate for your client when your client doesn't engage. They don't communicate with you, they don't contact you, and I know Ms. Thom has attempted to reach out to [respondent], and her attempts have been lost on [respondent]. So, even as recent as today, had Ms. Thom, on behalf of her client, requested more time given his appearance today, he would have been given that, but he just simply isn't following through.

As for respondent, the trial court found that he failed to engage with his service plan despite repeated attempts by the Department to communicate with him. Respondent also failed to provide for RW or be present in his life. Accordingly, the trial court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). This appeal followed.

## II. ANALYSIS

### A. PETITION ALLEGATIONS

Respondent first argues that the amended petition lacked sufficient allegations for the trial court to authorize it. Notably, respondent does not argue that the trial court erred by entering the order of adjudication. Accordingly, our review is limited to the issue of whether the amended

petition was proper because respondent has not asked us to consider the order of adjudication's merits.

A challenge to the trial court's jurisdiction over a child is preserved only if it is raised before the trial court terminates the respondent's parental rights to the child. *In re Baham*, 331 Mich App 737, 744-745; 954 NW2d 529 (2020). Respondent's argument that the petition lacked sufficient allegations for authorization attacks the trial court's jurisdiction over RW. Respondent did not argue at the trial-court level that the petition lacked sufficient allegations for authorization. Thus, the issue is unpreserved. See *id*.

Unpreserved issues are reviewed for plain error. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks omitted), citing *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). The appellant bears the burden of persuasion with respect to prejudice. See *Carines*, 460 Mich at 763. "We review the interpretation and application of statutes and court rules de novo." *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019).

Child-protective proceedings are initiated by a petition, which must contain "[t]he essential facts that constitute an offense against the child under the Juvenile Code." MCR 3.961(B)(3). "The [trial] court may authorize the filing of the petition upon a showing of probable cause, unless waived, that one or more of the allegations in the petition are true and fall within MCL 712A.2(b)." MCR 3.965(B)(12). See also *In re Ferranti*, 504 Mich at 15. In relevant part, MCL 712A.2(b) provides that a trial court has jurisdiction over a child:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

> * * *

> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

Neither the original nor the amended petition contained factual allegations about respondent's treatment of RW. Relevant to respondent, the original petition focused on his prior terminations and his criminal history. The amended petition added information about respondent's lack of communication with the Department. But neither petition included any factual allegations about respondent's treatment of RW or information about his lack of contact with and support of RW. The petitions, therefore, did not allege the essential facts for a violation of the Juvenile Code based on respondent's conduct.

But the petitions did allege that RW's mother's boyfriend assaulted RW's mother and RW's sister; furthermore, RW's mother had used methamphetamine in the home while the children were present. These allegations clearly demonstrated criminal behavior in the home. Accordingly, the assault fulfilled subsection (2)'s "criminality" requirement and established that the RW's home was unfit due to criminality. See *In re MU*, 264 Mich App 270, 279; 690 NW2d 495 (2004). Unlike subsection (1), subsection (2) does not require the action leading to jurisdiction to be the fault of the respondent. Accordingly, the factual allegations relating to subsection (2) were sufficient for the trial court to authorize the amended petition.

Additionally, because respondent had not seen RW in over a year and did not financially support him, respondent seemingly abandoned RW. This factor could be used as the statutory basis for jurisdiction under subsection (1). Although the petitions did not contain any factual allegations that respondent abandoned RW, they could have been amended to do so. See MCL 712A.11(6). Indeed, evidence at trial showed respondent's lack of involvement in RW's life and the termination petition contained sufficient allegations to satisfy MCL 712A.2(b)'s requirements. Although the termination petition was filed after the adjudication, it is probative under plain-error analysis to show that respondent was not prejudiced by the omissions in the original and amended petitions because they could have been amended to comply with MCL 712A.2(b). Given this, under plain-error review, respondent was ultimately not prejudiced by the deficiencies in the amended petition.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent next argues that Thom was ineffective as his trial counsel. Because no *Ginther*[2] hearing was held in this case, "our review is limited to the facts on the record." *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000). "A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008).

To establish a claim of ineffective assistance of counsel, respondent must show that: (1) defense counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007). Respondent counsel's performance is deficient if it fell below an objective standard of professional reasonableness. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). Respondent bears a heavy burden to show that counsel made errors so serious that counsel was not performing as guaranteed by the Sixth Amendment, and respondent must overcome a strong presumption that counsel's performance constituted sound trial strategy. *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001), citing *Strickland v Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984); *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). The performance will be deemed to have prejudiced the defense if it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. *Jordan*, 275 Mich App at 667. The

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

"reasonable probability" standard can be satisfied by less than a preponderance of the evidence. *People v Trakhtenberg*, 493 Mich 38, 56; 826 NW2d 136 (2012).

Respondent argues that Thom was ineffective as his trial counsel for a number of reasons, none of which have merit. First, respondent argues that Thom was ineffective as his trial counsel because she had a conflict of interest stemming from her status as the guardian ad litem for his children in his prior terminations. An alleged conflict of interest touches on counsel's duty of loyalty, "perhaps the most basic of counsel's duties" because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *People v Smith*, 456 Mich 543, 557; 581 NW2d 654 (1998). But the existence of a conflict of interest does not establish prejudice per se; "rather, prejudice is presumed only if the [respondent] demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Id*. (cleaned up).

The only evidence in the record about Thom's alleged conflict comes from Thom herself when she voluntarily disclosed the issue to the trial court at the start of the termination hearing. When making the disclosure, Thom stated that her former status as guardian ad litem did not make her represent respondent any differently than any other client. The record does not contain any other information on the matter, although we note that at the end of the termination hearing the trial court praised Thom's performance in this case. We agree with the trial court's assessment of Thom's performance. Thom represented respondent for months without ever speaking to him and appeared to do the best she could under the circumstances. Thom repeatedly cross-examined witnesses and argued that respondent's parental rights should not be terminated. Our review of the record does not suggest, much less establish, that Thom was attempting to undermine respondent's case. Accordingly, the record before this Court does not show that Thom's alleged conflict of interest undermined her performance as respondent's trial counsel.

We additionally note that respondent has not requested a *Ginther* hearing as an alternative remedy to outright reversal of the order terminating his parental rights. Respondent's argument that Thom was ineffective because of her prior representation of his children could only be established through further evidence obtained at a *Ginther* hearing. Respondent's failure to request a *Ginther* hearing further supports our conclusion that respondent is not entitled to relief based on his conflict-of-interest argument.

Respondent relatedly argues that Thom was ineffective for not objecting to the trial court taking judicial notice of the two court files of his prior terminations. But those files are public records and, therefore, the trial court could have taken judicial notice of them even if Thom had objected. See MRE 201. Additionally, respondent does not dispute the accuracy of the information the trial court took judicial notice of. Consequently, any objection would have been futile so Thom was not ineffective for not objecting to the trial court taking judicial notice of those files. See *People v Chambers*, 277 Mich App 1, 11; 742 NW2d 610 (2007).

Respondent next argues that Thom was ineffective for failing to ask for more time for respondent to participate in services. This stems from the trial court's statement while making its factual findings that, "even as recent as today, had Ms. Thom, *on behalf of her client*, requested more time given his appearance today, he would have been given that, but he just simply isn't following through." (Emphasis added.) But Thom did ask the trial court in her closing argument

to give respondent more time to benefit from services. Given that Thom clearly asked for additional time for respondent to participate in services, the best reading of the trial court's statement is that it was willing to delay the termination hearing if respondent himself (or through Thom) expressed a desire for more time to benefit from the services offered to him. That said, respondent did not request that the hearing be delayed and nothing in the record explains the reason for respondent's appearance and subsequent absence from the termination hearing. Given that Thom did ask for more time, respondent's argument that she should have made the exact same argument "on behalf of [respondent]" cannot establish that she was ineffective as respondent's trial counsel. Additionally, given respondent's complete lack of cooperation with the Department throughout the entirety of this case, nothing in the record suggests that he would have eventually been reunified with RW even if respondent had been given additional time to benefit from services.

Respondent next argues that Thom was ineffective for failing to request a jury, presumably for the adjudication trial. But the trial occurred before Thom had any contact with respondent so she had no way to know whether respondent wanted a jury trial. Additionally, the facts supported the trial court's adjudication order given the criminality in RW's home and respondent's apparent abandonment of RW. See MCL 712A.2(b). Respondent does not explain why the outcome may have been different if a jury instead of the trial court made the factual findings at trial. His reliance on *In re Ferranti*, 504 Mich at 30, is unavailing because in *In re Ferranti* the respondents gave invalid pleas to jurisdiction so there was no bench trial. But there was a bench trial here so, unlike in *In re Ferranti*, the Department presented its case and a fact finder concluded that there were sufficient facts to support an order of adjudication. Thus, Thom was not ineffective for failing to request a jury trial.

Respondent next argues that Thom was ineffective for failing to object to the results of the Forensic Fluids lab results at the termination hearing. But the rules of evidence do not apply at a termination hearing. See MCR 3.977(H)(2). Respondent's argument to the contrary that the rules of evidence applied to the lab-test results because respondent's substance abuse was a circumstance that arose after the trial court took jurisdiction is incorrect. See MCR 3.977(F). Respondent relatedly argues that the Department may have chosen to avoid the hassle of admitting the lab-test results if the normal rules of evidence applied; he does not argue that the lab-test results were unreliable or that Thom should have cross-examined the author of the lab-test report. Accordingly, the lab-test results were written reports that the trial court was authorized to rely upon "to the extent of [their] probative value." See MCR 3.972(H)(2). Thus, any objection to their admission would have been futile so Thom was not ineffective for failing to make such an objection. See *Chambers*, 277 Mich App at 11.

Finally, respondent cursorily argues that Thom was ineffective for waiving respondent's appearance at the termination hearing, failing to object to a referee presiding over the hearing instead of a trial judge, and failing to present her own witnesses. But respondent has not articulated why or how he was prejudiced by any of these alleged deficiencies. Accordingly, each of these arguments are abandoned. See *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015). Additionally, respondent had not met his burden to show prejudice based on these alleged deficiencies. See *Taylor*, 275 Mich App at 186. Nor can he. Respondent apparently left the termination hearing on his own accord, nothing in the record suggests that a different fact-finder would have ruled differently than the referee did, and defense attorneys are not required to present any evidence or witnesses because that is a strategic decision (and respondent has not argued that

any specific witnesses or other proofs should have been presented to help his case), *People v Davis*, 250 Mich App 357, 368-369; 649 NW2d 94 (2002). Thus, Thom was effective as respondent's trial counsel.

## C. REASONABLE EFFORTS

Respondent's final argument is that the Department failed to make reasonable efforts to reunify him with RW. In order to preserve this issue, respondent was required to "object or indicate that the services provided to [him] were somehow inadequate." *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). "The time for asserting the need for accommodation in services is when the court adopts a service plan . . . ." *Id*. (quotation marks and citation omitted; alteration in original). Respondent did not make any such argument at the trial court level. Thus, the issue is unpreserved and reviewed for plain error. See *In re VanDalen*, 293 Mich App at 135.

As an initial matter, the Department argues that it was not required to make reasonable efforts to reunify respondent with RW because respondent's parental rights had been involuntarily terminated to at least one child in the past. If that statement is accurate, the Department is correct. See MCR 3.965(C)(4)(c). But the record does not establish that respondent's prior terminations were involuntary. Although the trial court took judicial notice of Midland Circuit Docket Nos. 14-8679-RL, and 12-4009-NA, nothing in the record actually confirms that either prior termination was involuntary. The record certainly suggests as much based on Thom's representation of the children in those cases and the Department's statement in its brief on appeal that Docket No. 12-4009-NA was an involuntary termination. But the details of those prior terminations were never addressed in the hearings and the Department did not attach any information to its brief on appeal that would allow us to confirm the Department's assertion.

In the face of this factual uncertainty, we now turn to the merits of whether the Department made reasonable efforts to reunify respondent with RW. "In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal . . . ." *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). An order terminating parental rights must state "whether reasonable efforts have been made to . . . rectify the conditions that caused the child's removal from his or her home." MCL 712A.18f(4). "[T]ermination is improper without a finding of reasonable efforts." *In re Hicks/Brown*, 500 Mich 79, 90; 893 NW2d 637 (2017). "As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86. That said, "[w]hile the [Department] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App at 248. A respondent must also demonstrate that he has benefitted from services proffered. *Id*.

The Department made repeated attempts to find and communicate with respondent throughout this case, but they were largely unsuccessful. All of the successful communication with respondent was initiated by him, but he largely failed to initiate contact with the Department despite having the original petition since March 2020. Despite his knowledge of the proceedings, respondent did little to engage with the Department. Additionally, the Department created a

service plan for respondent in August 2020, but he never engaged in it or completed any portion of the service plan.

White repeatedly attempted to contact respondent from August 2020 to October 2021, although she did not have records for that entire time and her records do not show that she called respondent from December 2020 to June 2021. Respondent contacted her in June 2021 and they scheduled a meeting that respondent canceled. Then respondent seemingly disappeared again, only resurfacing in October 2021. At that point, White was able to talk and meet with respondent, but he still had not completed any services by the time of the termination hearing.

The record shows that respondent was exceedingly difficult to contact throughout these proceedings. The Department repeatedly attempted to contact respondent throughout the entirety of this case, with the possible exception of December 2020 to June 2021. But even during that time, respondent was aware of the case and he did not reach out to the Department. Respondent had an obligation to participate in and benefit from his service plan, but he failed to do so. See *In re Frey*, 297 Mich App at 248. Given this, the Department made reasonable efforts to reunify respondent with RW.

### III. CONCLUSION

For the reasons stated in this opinion, the trial court's order terminating respondent's parental rights is affirmed.


/s/ Brock A. Swartzle
/s/ Amy Ronayne Krause
/s/ Kristina Robinson Garrett

-10-