*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

OTHA LEE CARROLL,

       Defendant-Appellant.

UNPUBLISHED
May 30, 2024

No. 362404
Calhoun Circuit Court
LC No. 2018-003428-FC

Before: MARKEY, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

Defendant, Otha Lee Carroll, appeals by right his jury-trial convictions of first-degree felony murder, MCL 750.316(b), first-degree arson, MCL 750.72, and assault with intent to commit murder, MCL 750.83. The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to life in prison without parole for the murder conviction and to 20 to 30 years' imprisonment for the arson and assault convictions. We affirm.

## I. TRIAL TESTIMONY AND EVIDENCE

The convictions arose from the murder of Dennis Selmon, who was beaten with a blunt object and then left to die in his home that was set ablaze, and the assault of Megan Aston, who was also beaten with a blunt object and left in the burning home. Emergency personnel pulled Aston out of the home, and she survived. Aston testified at the preliminary examination. Before trial, however, she died of a drug overdose unrelated to the offenses. Aston's preliminary examination testimony was read into the record at trial. Aston recalled the events surrounding the attack and identified defendant, whom she knew, as her assailant.

Selmon was a disabled veteran whose house was known for both drug use and drug sales. Defendant often visited Selmon and would drive him to the local Veterans Affairs office to pick up Selmon's disability checks. On the day of the assaults and fire, defendant went to Selmon's house early in the morning. Before leaving, he helped Selmon administer heroin to himself. Later in the day, defendant returned to the home. Aston let defendant into the house and locked the door behind him. Defendant went to speak with Selmon, and Aston walked to the bathroom to use heroin.

-1-

When Aston was in the bathroom, the door swung open, and she saw defendant. He struck Aston in the back of the head repeatedly. Aston did not know for certain the identity of the object defendant used to strike her, but she believed that it was a hammer that may have been left outside the front door by an associate named Tommy. Tommy had knocked on Selmon's door approximately 15 minutes before defendant's arrival. Defendant dragged Aston out of the bathroom and into the living room. In the living room, Aston observed Selmon lying on the ground. She saw fire spreading over the living room wall. Defendant walked back and forth in the living room and then left the residence.

Aston passed out but regained consciousness upon hearing the sound of banging on the door. She yelled for help, and two firefighters, including Jim Mervyn, broke down the door. Mervyn entered the house and pulled Aston outside to safety, placing her on the front lawn. Mervyn testified that Aston was covered in blood, had several fractures, and suffered injuries to her head. Mervyn provided medical care to Aston until an ambulance arrived. Firefighters were unable to remove Selmon from the fire, and he perished.

Police arrived at the scene when the house was still on fire and Aston was being loaded into the ambulance. Battle Creek Police Department Corporal Nathaniel Hopkins saw Aston bleeding profusely from her head wounds. Concerned that she would die, Corporal Hopkins spoke with Aston in an effort to gain information about any suspects. According to Corporal Hopkins, Aston told him that defendant hit her in the head with a hammer. When Corporal Hopkins asked her about defendant's name, Aston spelled "O-T-H-A" for him. Mervyn was also present for this conversation, but he could not recall what Aston told Corporal Hopkins. As reflected in the reading of Aston's preliminary examination testimony, she testified that she told Corporal Hopkins that defendant had attacked her. Battle Creek Police Department Officer Gregory Gammons also spoke to Aston at the scene. He testified that she was in pain but completely conscious and that she informed him that defendant assaulted her and Selmon with a hammer. The medical examiner who conducted an autopsy of Selmon opined that he died from blunt force trauma, thermal injuries, and smoke inhalation.

Defendant's wife, Rosunda Jones-Carroll, testified that defendant picked her up from work on the date the offenses were committed. With her and their son in the car, defendant drove to Selmon's house. Jones-Carroll and the child stayed in the car, and defendant went inside Selmon's home. Jones-Carroll testified that when defendant returned to the car, she did not smell gasoline on him,[1] nor did she notice any blood on his person. Afterward, defendant drove them to the house of a friend named "T." Defendant went inside the residence while Jones-Carroll and the child once again waited in the car. When defendant returned to the vehicle, he drove Jones-Carroll and their son to McDonald's to eat. Jones-Carroll testified that defendant remained in the car and got high on heroin. She further claimed that when defendant had injected the heroin, he bled on the door of the car. The three of them then went to the Dollar Store to purchase cleaner for the stain.

Next, they drove to their apartment, which was being surveilled by undercover police officers after defendant was developed as a suspect in the murder and arson. Defendant saw an

---

[1] The prosecution presented expert scientific testimony that gasoline was used as an accelerant to start and spread the fire.

acquaintance who warned defendant that Aston "has your name in the streets." Defendant and Jones-Carroll left the apartment and started to drive away when officers attempted to pull them over. Instead of stopping, defendant drove away, striking several of the cars in the apartment complex's parking lot, including an officer's vehicle. After driving around for some time, defendant decided to go to the police station.

At the police station, defendant told an officer that he came to the station to report that he had struck an officer's vehicle and that he had heard that his friend Selmon overdosed. Defendant was interrogated at the police station. In the interview, he confirmed that he was at Selmon's house near the time of the fire and repeatedly stated that Selmon overdosed. Battle Creek Police Department Detective Randy Reinstein testified that he told defendant that Aston had implicated him in the crimes, at which point defendant stopped the interrogation. Detective Reinstein further testified that he spoke to Aston several times and that she never wavered about the identity of her assailant.

Officers noticed blood spatter on defendant's pants and shirt and collected the clothing for testing. At trial, Heather Goff, a forensic scientist with the Michigan State Police Forensic Laboratory, testified as an expert in DNA-interpretation analysis. She testified that DNA found on defendant's shirt was at least 470,000 times more likely to have originated from defendant, Aston, and one unrelated unknown contributor, which indicated strong support that Aston was a contributor to the DNA on defendant's shirt.

As indicated, defendant was convicted of first-degree felony murder, arson, and assault with intent to commit murder, but he was acquitted of two counts of assaulting, resisting, or obstructing a police officer. Defendant now appeals.

## II. HEARSAY TESTIMONY

Defendant challenges the admission under MRE 803(4) (statement made for medical treatment) of Corporal Hopkins's testimony that Aston stated that "she was hit in the head with a hammer by [defendant]" and that Aston spelled aloud defendant's name when she was being loaded into the ambulance to be taken to the hospital.

We are a bit puzzled by this argument because while defendant challenges Corporal Hopkins's testimony about Aston's statements incriminating defendant, he does not challenge the admission of Aston's preliminary examination testimony in which she identified defendant as her assailant, the admission of Officer Gammons's testimony that Aston told him that defendant attacked her with a hammer, and the admission of Detective Reinstein's testimony referencing Aston's assertion that defendant assaulted her and that Aston never wavered in her identification of her assailant. Indeed, Aston testified that she informed Corporal Hopkins that defendant was the perpetrator.

Whether we review this argument as preserved or unpreserved,[2] and assuming the trial court erred by admitting the testimony under MRE 803(4), defendant has not demonstrated any prejudice. See MCL 769.26 (error in the admission of evidence generally requires reversal only when the error resulted in a miscarriage of justice); *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999) (The effect of an "error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error."); *People v Jones*, 468 Mich 345, 355-356; 662 NW2d 376 (2003) (plain-error review requires consideration whether any error was prejudicial); *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (setting forth the scope of plain-error analysis). In light of the other testimony that Aston had identified defendant as the person who assaulted her, along with consideration of additional evidence that defendant was at the crime scene, that he had blood splatter on his clothing, that DNA evidence strongly linked Aston's blood to the blood on defendant, and that defendant initially attempted to elude police, defendant has not shown a miscarriage of justice or that it was more probable than not that the verdicts would have been different but for the presumed error. Prejudice has not been established, and any error was harmless.[3]

## III. WITNESS VOUCHING

Next, defendant contends that Detective Reinstein improperly vouched for the credibility of his investigation of the crime and identification of defendant as the assailant and that he also improperly vouched for Aston's credibility. Defendant argues that he was denied a fundamentally fair trial due to the prosecutor's misconduct in eliciting testimony in which Detective Reinstein impermissibly bolstered his own credibility and Aston's credibility. Finally, defendant maintains

---

[2] Although trial counsel objected when it appeared that firefighter Mervyn was about to testify to statements made by Aston, which he did not do for lack of recall, there was no follow-up objection when Corporal Hopkins testified in regard to Aston's statements.

[3] Moreover, we conclude that Corporal Hopkins's testimony was admissible as an "excited utterance" under MRE 803(2) because Aston's statements certainly related to a startling event or condition and were made under the stress of excitement caused by the event or condition. The excited-utterance exception in MRE 803(2) "allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy." *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998). Aston was bludgeoned in the head and had been left to die in a fire when she was pulled to safety, making her statements shortly after this external startling event. We also believe that the testimony was admissible as a present-sense impression under MRE 803(1). See *People v Chelmicki*, 305 Mich App 58, 63; 850 NW2d 612 (2014) (victim's statement made on the night of the incident was admissible in a domestic-assault prosecution under the present-sense-impression exception to the hearsay rule, where the statement described the event that took place, the victim perceived the event personally, and where the statement was made within fifteen minutes of the underlying incident). In sum, the trial court did not abuse its discretion or otherwise err by admitting Corporal Hopkins's testimony. *Lukity*, 460 Mich at 488.

that trial counsel was ineffective for failing to object to the prosecutor's questions and the challenged testimony. We disagree on all accounts.

Jurors are the judges regarding the credibility of testimony offered by witnesses. *People v Musser*, 494 Mich 337, 348-349; 835 NW2d 319 (2013). Because it is the province of the jury to assess or evaluate whether a witness spoke the truth or lied, "it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *Id.* at 349. A witness's comments or remarks concerning the credibility of others have no probative value given that they do nothing to assist the jury in determining a witness's credibility in relation to its factfinding mission and its assessment of guilt or innocence. *Id.*

With respect to the claim of improper vouching by Detective Reinstein in relation to his own testimony, the testimony defendant cites and challenges simply concerned the investigation's focus on defendant and Detective Reinstein's efforts to make sure there was no one else named "Otha" who could possibly be connected to the crime. First, defendant cites no authority for the proposition that a witness cannot vouch for or bolster his or her own testimony. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004) (quotation marks and citation omitted; alteration in original). Such cursory treatment effectively equates to abandonment of the issue. *Id.* Second, there was nothing improper about Detective Reinstein's merely testifying with respect to the thoroughness of his investigation and the focus on defendant. The testimony was relevant and admissible. See MRE 401 and 402. Accordingly, there was no prosecutorial misconduct with respect to the questioning of Detective Reinstein,[4] and trial counsel was not ineffective for failing to object to the pertinent examination and testimony.[5]

With respect to Detective Reinstein's challenged testimony regarding Aston, we note that the detective merely testified that Aston never wavered in relation to identifying her assailant during the numerous conversations he had with her about the attack. This testimony did not constitute vouching for Aston's credibility; it was not even in the form of an opinion. Rather, Detective Reinstein merely conveyed *facts* concerning Aston's identifications of defendant as the perpetrator, leaving it to the jury to evaluate whether it demonstrated that Aston was credible and being truthful. The testimony was relevant and admissible. Accordingly, there was no prosecutorial misconduct in eliciting the testimony, nor was counsel ineffective for failing to challenge the testimony.

---

[4] "A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *People v Dobek*, 274 Mich App 58, 70; 732 NW2d 546 (2007). And there is no prosecutorial misconduct in eliciting admissible evidence. See *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007).

[5] "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## IV.  EVIDENCE OF ALLEGED RECANTATION

Finally, defendant contends that the trial court erred when it refused to allow a defense witness, Thomas Howlett, to testify that Aston had recanted her preliminary examination testimony, thereby violating defendant's rights under the Confrontation Clause as well as his due-process right to present a defense.  Furthermore, according to defendant, the trial court abused its discretion when it denied his motion to expand or supplement the record to include the exact testimony that Howlett would have provided at trial had he been permitted to testify in regard to Aston's statements.

During the trial, defendant called Howlett to the stand.  Howlett testified that he had known Selmon, Aston, and defendant for several years.  Howlett stated that he used drugs at Selmon's house more than once in the past.  He further testified that on the day of the fire, he went to Selmon's house, but Aston would not let him in.  Howlett left the home, got high, returned to Selmon's house approximately 15 to 20 minutes later, and found that it was on fire.  After this testimony, Howlett began to testify that he had a conversation with Aston in Battle Creek after Selmon died.  When defense counsel asked Howlett what Aston told him, the prosecution objected to the admission of any statements made by Aston to Howlett on hearsay grounds.  Defense counsel began to respond to the objection, and the trial court halted the argument and excused the jury.

A lengthy discussion and argument over the admissibility of Howlett's prospective testimony took place.  The prosecutor emphatically contended that Howlett's testimony about statements made by Aston would be hearsay absent any exception, and defense counsel maintained that *Miller v MacLaren*, 737 Fed Appx 269 (CA 6, 2018) (unpublished opinion), supported the admission of such testimony to establish a prior inconsistent statement.  Defense counsel also argued that excluding the testimony would offend the Confrontation Clause, whereas the prosecutor contended that the Confrontation Clause would not be implicated under the circumstances.  The trial court ultimately determined that Howlett's prospective testimony would constitute inadmissible hearsay and that it could not be introduced as extrinsic evidence of a prior inconsistent statement under MRE 613(b) because Aston was not available to explain or deny Howlett's testimony concerning Aston's purported statements.[6]  We note that while the parties and the court seemed to implicitly accept or assume that Howlett's proposed testimony would reveal that Aston recanted her preliminary examination testimony inculpating defendant, no offer of proof was made or attempted, nor did defense counsel ever explicitly indicate what Howlett's testimony would entail.  We have no record demonstrating that Howlett was prepared to actually provide true recantation testimony, that, if so, it pertained to a time period either before or after the preliminary examination, or that the extent or nature of any recantation testimony would be pertinent to the

---

[6] At the time of trial, MRE 613(b) provided, in relevant part:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

identification of defendant as the perpetrator, as opposed to some peripheral matter concerning the assaults and fire.[7]

After trial and the filing of this appeal, defendant moved in the trial court to expand or supplement the record under MCR 7.208(C) so Howlett's prospective testimony could be ascertained. In the motion, defendant asserted:

> In all the discussion [of the issue at trial], it was never actually proffered or reported "what" exactly Thomas Howlett's proposed testimony would have consisted of. There was discussion that his proposed testimony would have involved some sort of recantation by Megan Aston, but the details of the recantation were never stated on the record. Thus, we do not know in what respects Megan Aston is supposed to have recanted.

Defendant stated in the motion that supplementation would involve potential testimony from trial counsel, the investigator who located Howlett, and Howlett himself, if he could be located. The motion was filed approximately 10 months after the trial was concluded. Despite that extensive lapse of time, defendant did not procure or attach any affidavit or otherwise present some type of offer of proof from trial counsel, the investigator, or Howlett himself.

The trial court denied the motion to expand or supplement the record on the basis that it was clear from the record that Howlett's testimony would encompass some type of recantation by Aston and that the court did not need to know the exact nature of Howlett's prospective testimony to assess its admissibility.

Given the record and the need for us to engage in pure speculation regarding the testimony that Howlett would have provided if given the opportunity, defendant cannot show or establish a Confrontation Clause violation or a deprivation of his due-process right to present a defense, assuming the legal framework even allowed for consideration of those constitutional principles. Moreover, if we were to find a Confrontation Clause violation despite the need to employ conjecture in doing so, it would be necessary to assess whether the error was harmless beyond a reasonable doubt. *People v Shepherd*, 472 Mich 343, 348; 697 NW2d 144 (2005). And with respect to the unpreserved due-process argument, if we found a constitutional violation that constituted plain error despite, again, the need to employ conjecture in doing so, it would then be necessary to assess whether the plain error prejudiced defendant. *People v Carines*, 460 Mich 750, 763, 774; 597 NW2d 130 (1999). In either case, properly determining harmlessness or prejudice would be next to impossible absent an offer of proof or some knowledge regarding Howlett's prospective testimony.

With respect to defendant's argument that the trial court abused its discretion when it denied his motion to expand or supplement the record to include the exact testimony that Howlett would have provided at trial, we reject the argument. Defendant filed the motion to expand or

---

[7] Assuming a relevant recantation, we also have no record regarding the surrounding circumstances of any conversation between Aston and Howlett, both of whom used illicit drugs, which drug use eventually resulted in Aston's death.

supplement the record under MCR 7.208(C), but this provision concerns the correction of defects in the record by the trial court after a claim of appeal has been filed. Defendant's position did not technically pertain to a "defect" in the record, which calls into question the trial court's jurisdiction to even entertain the motion. MCR 7.211, which encompasses motion practice in this Court, provides in subsection (C)(1)(a)(ii) that a motion to remand to the trial court can be filed on the basis "that development of a factual record is required for appellate consideration of [an] issue" sought to be reviewed on appeal. That is exactly what defendant was attempting to accomplish in this case. Moreover, a motion brought under MCR 7.211(C)(1)(a)(ii) "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing." Defendant did not move for remand in this Court.

Defendant was seeking an evidentiary hearing in an effort to elicit testimony regarding how Howlett would have answered the question about statements Aston made to him. Although the trial court denied the motion to expand or supplement the record on the basis that relevant recantation testimony would not change the court's earlier ruling, we conclude that defendant is not entitled to an evidentiary hearing because he failed to submit any affidavit or offer of proof that would justify an evidentiary hearing. While MCR 7.208(C) does not require an affidavit or offer of proof, defendant was actually seeking relief that should have been pursued under MCR 7.211(C)(1)(a)(ii), which does require an affidavit or offer of proof. We will not allow defendant to circumvent the demands of the court rules. Although we can appreciate that it might be difficult to locate Howlett and obtain an affidavit from him, trial counsel and his investigator would not have presented the same impediments or hurdles.[8] In sum, we hold that reversal is unwarranted.

We affirm.

/s/ Jane E. Markey
/s/ Michael J. Riordan
/s/ Thomas C. Cameron

---

[8] We do note that affidavits from counsel and the investigator, or even their testimony, may not have been sufficiently persuasive as to how Howlett would have testified: Howlett may have even surprised them with his testimony despite what he might have previously told them. We cannot understand why—with the jury excused and Howlett in the courtroom or courthouse—an offer of proof was not made by having Howlett state how he would answer the question at issue. See MRE 103(a)(2).